# UNITED STATES *v.* OMAHA TRIBE OF INDIANS.

# OMAHA TRIBE OF INDIANS *v.* UNITED STATES.

## APPEALS FROM THE COURT OF CLAIMS.

Nos. 243, 244.   Argued March 18, 1920.—Decided June 1, 1920.

Findings purely of fact or of mixed fact and law are not reviewable on appeal from the Court of Claims. Pp. 280, 281.

By the Treaty of March 16, 1854, Art. 7, 10 Stat. 1043, the United States agreed to protect the Omahas from the Sioux and other hostile tribes as long as the President might deem such protection necessary. In a suit under the jurisdictional Act of June 22, 1910, c. 313, 36 Stat. 580, *held*, that failure to provide necessary protection did not render the United States liable to pay for horses stolen and Omahas killed by the Sioux, in the absence of a finding that the protection was deemed by the President to be necessary. Pp. 280, 283.

The agreement of the United States, in the Treaty of March 6, 1865, 14 Stat. 667, to pay a certain sum to the Omahas to be expended for cattle, etc., for their benefit, was not complied with by supplying cattle which died after reaching the reservation as a result of bad condition when purchased or of bad treatment while being driven there from market; and a finding that such cattle "when they reached the reservation were in bad condition and 50 of them died," necessarily imports that death was due to one or the other of those causes rather than to the hardships of the drive. Pp. 279, 280.

Under the treaties of 1854, *supra*, Art. 4, and of 1865, *supra*, Art. 2, certain moneys of the Omahas were to be or might be expended by the United States in the way of improvements for their benefit, Art. 4 authorizing the President to expend part "for such beneficial objects as in his judgment will be calculated to advance them in civilization" and "for medical purposes." *Held:* (1) That a finding that a building, constructed as an infirmary, "was not used, and it was not such a building as was contemplated by the treaties," should be interpreted as meaning that it was not suitable for its purpose and was not accepted by the Indians; (2) that the Indians were not obliged to accept it, and the expenditure was a misappropriation of their funds "for purposes not for their material benefit," within the jurisdictional Act of June 22, 1910, *supra*. Pp. 279, 281.

By the Treaty of 1854, *supra,* the land of the Omahas south of a certain line was ceded for a fixed consideration to be paid in the future either in money or through expenditures for their use from time to time at the President's discretion, and it was provided that, upon a certain contingency (which took place), their land north of the line "shall be and is hereby ceded" at the same rate per acre as paid for the land south, deducting the area of a new reservation to be assigned. *Held,* that in the second case, as in the first, the passing of title was not conditioned upon payment of the consideration, and that interest upon the amount to be paid was not allowable. Jud. Code, § 177.　P. 281.

The fact that the jurisdictional Act of June 22, 1910, *supra,* authorized the determination of all equitable as well as legal claims of the tribe did not take the case out of the rule denying interest on claims against the Government.　P. 283.　*United States* v. *Old Settlers,* 148 U. S. 427, distinguished.

53 Ct. Clms. 549, reversed in part; affirmed in part.

THE case is stated in the opinion.

*Mr. Assistant Attorney General Davis,* with whom *Mr. Geo. T. Stormont* was on the brief, for the United States.

*Mr. Charles H. Merillat,* with whom *Mr. Charles J. Kappler* and *Mr. Hiram Chase* were on the brief, for the Omaha Tribe of Indians.

MR. JUSTICE PITNEY delivered the opinion of the court.

We have here an appeal and a cross-appeal from a judgment of the Court of Claims in a suit brought under the Act of June 22, 1910, c. 313, 36 Stat. 580, which conferred upon that court jurisdiction to hear and determine "all claims of whatsoever nature which the Omaha tribe of Indians may have or claim to have against the United States . . . under the treaty between the United States and the said tribe of Indians, ratified and affirmed March sixteenth, eighteen hundred and fifty-four, or under

any other treaties or laws, or for the misappropriation of
any funds of said tribe for purposes not for its material
benefit, or for failure of the United States to pay said tribe
any money due"; with authority to hear and determine all
legal and equitable claims of the tribe, and also any legal
or equitable defense, set-off, or counterclaim, and to settle
the rights both legal and equitable of the parties, notwith-
standing lapse of time or statutes of limitation.

The Court of Claims, after hearing the case, made findings
upon which it awarded judgment in favor of the Indians for
various sums aggregating $122,295.31.    53 Ct. Clms. 549.

By Article 1 of the Treaty of March 16, 1854 (10 Stat.
1043), the Omaha Indians ceded to the United States all
their lands west of the Missouri River and south of a line
drawn due west from a point stated, reserving the country
north of that line for their future home, with a proviso that
if this country should not, on exploration, prove to be a
satisfactory and suitable location for the Indians the
President might with their consent set apart and assign to
them, within or outside of the ceded country, a residence
suited for and acceptable to them, not greater in extent
than 300,000 acres, in which case all of the country belong-
ing to said Indians north of the line specified should be
ceded to the United States, and the Indians should receive
the same rate per acre for it, less the number of acres
assigned in lieu of it, as was agreed to be paid for the lands
south of the line.   By Article 4, in consideration of and
payment for the country thus ceded, and certain relin-
quishments made by the Indians, the United States agreed
to pay to them certain sums of money aggregating $840,-
000, in specified annual installments commencing on Jan-
uary 1, 1855; these sums to be paid to the Omahas or ex-
pended for their use and benefit under the direction of the
President of the United States, who was from time to time
to determine at his discretion what proportion of the annual
payments should be paid in money and what proportion

applied to and expended for the moral improvement and education of the Indians; for such beneficial objects as in his judgment would be calculated to advance them in civilization; for buildings, opening farms, fencing, breaking land, providing stock, etc.; and for medical purposes. By Article 5, in order to enable the Indians to settle their affairs and to remove and subsist themselves for one year at their new home, and for certain other expenses, they were to receive from the United States the further sum of $41,000, to be paid out and expended under the direction of the President and in such manner as he should approve.

The Court of Claims found that the Omahas were not satisfied with the country to the north of the east-and-west line mentioned, and duly elected to take for their future home a tract of 300,000 acres south of the line; and this fact being reported to the President, by his direction a tract of 300,000 acres south of the line was set apart for them. The court found that the area of the land north of the line belonging to the Indians was 783,365 acres, and that after deducting from this the 300,000 acres set apart for them in accordance with the provisions of the treaty there was an excess of 483,365 acres, for which they had not been paid. The price for this was fixed by taking the aggregate of the treaty payments ($881,000) and dividing it by 4,500,000 acres, the area of the lands south of the line ceded by the Omahas to the United States, making the treaty price 19.6 cents per acre, at which rate the 483,365 acres for which the Indians were still to be paid amounted to $94,739.54. This was awarded to them.

The court found that of the $41,000 specified in Article 5, the Government expended $23,453.21 in carrying out the provisions of that article, and the balance, $17,546.79, remained in the hands of the Indian agents of the United States charged with the disbursement of the treaty funds, who were guilty of defalcations of this and other moneys to the aggregate amount of $18,202.19. This was allowed.

By the 7th Article of the treaty the United States agreed to protect the Omahas from the Sioux and all other hostile tribes as long as the President might deem such protection necessary. The court found that after the treaty the Sioux made repeated attacks upon the Omahas in the year of removal and subsequent years; that the United States was called upon by the Omahas to protect them, and such protection was necessary as soon as they removed to their new home and for several years thereafter, but no protection was afforded them by the United States. The Sioux killed 22 Omahas and stole 152 horses, the latter worth $30 per head. The court allowed $4,560 for the horses, but made no allowance for the Indians killed.

By a treaty concluded March 6, 1865 (14 Stat. 667), the United States agreed to pay the Omahas for the cession of a part of their reservation the sum of $50,000, to be expended "for goods, provisions, cattle, horses," etc., for their benefit. Pursuant to this, as the Court of Claims found, 103 head of stock cattle were delivered in the year 1867 for which $3,432.99 was paid out of money belonging to the Omahas. "These cattle when they reached the reservation were in bad condition and 50 of them died," of an average value of $33.33 per head, the 50 being worth $1,666.50. This sum was allowed.

Under Article 4 of the Treaty of 1854 and Article 2 of the Treaty of 1865 certain moneys were to be or might be expended for the benefit of the Indians in the way of improvements upon their reservation, and in other ways. Under these provisions, in the year 1875 an infirmary was constructed upon the Omaha and Winnebago consolidated reservation. The Court of Claims found that this building was not used, and was not such a building as was contemplated by the treaties with the Omahas; and that of its cost, $3,127.08 was paid out of money belonging to them. This sum was allowed.

The principal reason for the Government's appeal lay in

the award to the tribe of $94,739.54 for the excess land north of the dividing line mentioned in the treaty; it having been contended in the court below that the tribe owned none of that land. The Court of Claims having found to the contrary, the Government moved this court, after taking appeal, for an order remanding the case with directions for further findings on the question. This motion having been overruled, as well as a counter motion submitted by the claimant for a certification of the entire record to this court, the Government concedes that it cannot contest the correctness of the judgment upon this item.

As to the item of $4,560 allowed as the value of horses killed by the Sioux Indians, we conclude that the objection of the Government is well founded. The obligation of the treaty was to protect the Omahas from the Sioux and other hostile tribes "as long as the President may deem such protection necessary." The obligation depended upon an exercise of discretion by the President. There is no finding of a failure to provide any protection deemed by the President to be necessary; hence nothing to create a liability, legal or equitable, under the treaty clause.

The item of $18,202.19 allowed for defalcations of the Indian agents is not disputed.

The Government contests the allowance for the stock cattle upon the ground that the fact that they were in bad condition when they reached the reservation is not sufficient to show that they were in such condition when purchased; it being suggested that their defective condition upon reaching the reservation may have been due to the rigors and hardships of the drive from the market to the reservation. We cannot so interpret the finding; deeming its necessary import to be that the cattle either were in bad condition when purchased or were badly cared for on the way to the reservation. In either event the fault lay with the agents of the United States, and the Indians were entitled to credit for the sum allowed on this account.

The allowance for the infirmary is disputed upon the ground that the treaties, fairly construed, gave authority for expending moneys of the Omahas for this purpose, especially the very general language of Article 4 of the Treaty of 1854 authorizing the President to expend a part of the fund "for such beneficial objects as in his judgment will be calculated to advance them in civilization" and "for medical purposes." We construe the finding, "This building was not used, and it was not such a building as was contemplated by the treaties," as meaning not that a building of this general character was not contemplated, but that the particular building was not what it ought to have been, and not suitable for the use of the Indians. So construed, it is either a finding upon a mere question of fact, or at most a finding of mixed fact and law where the question of law is inseparable. In the latter case, as in the former, the finding, on familiar principles, is not reviewable. *Ross* v. *Day*, 232 U. S. 110, 116–117, and cases cited. The fact that the building was not used shows that the tribe did not accept it, and received no benefit from it. And since, because of its unfitness, they were not obliged to accept it, the expenditure of their money in its construction was a misappropriation of funds of the tribe "for purposes not for its material benefit," within the meaning of the jurisdictional act. We affirm the allowance of this item.

Upon the cross-appeal, assignments of error are based upon the disallowance of interest. As to the $94,739.54 awarded for the land north of the dividing line in excess of 300,000 acres, it is contended that payment of this consideration was a concurrent condition of the passing of title to the United States, and as equity considers that as done which ought to be done the purchase money was, potentially, in the Treasury of the United States as a trust fund, and ought to be treated as if invested for the benefit of the Indians at 5 per cent. interest, under Rev. Stats.,

§§ 2095, 2096 and 3659; or, in the alternative, that the assumption by the United States of title to the land without compliance with the concurrent condition of payment to the Indians and its sale by the United States to settlers was a breach of trust requiring the United States to account to the Omahas for the minimum sale price of $1.25 per acre. But the provisions of Articles 1 and 4 of the treaty show that the theory that the passing of title was conditioned upon the payment of the consideration money, or any part of it, is untenable; hence there was no such trust as is asserted; and the price of the land was fixed by the treaty itself. By Article 1 there was a cession *in præsenti* of the land south of the described line, with a proviso that if upon exploration the country north of the line did not prove to be a satisfactory and suitable location for the Indians the President might, with their consent, set apart and assign to them a suitable residence, in which case all of the country belonging to them north of the line "shall be and is hereby ceded to the United States by the said Indians, they to receive the same rate per acre for it, less the number of acres assigned in lieu of it for a home, as now paid for the land south of said line." By Article 4 the consideration money for the principal cession was to be paid in the future, and either paid to the Indians direct or expended for their use and benefit from time to time, in the discretion of the President; and, by fair construction, the money that the Indians were to receive under Article 1 for the additional cession of the land north of the line, in the event of such cession taking effect, was subject to the same terms as to payment, at least to the extent that it was for the President to determine in his discretion whether it should be paid in cash to the Omahas or expended for their benefit "from time to time." Clearly, an intent to defer passing of title until payment of consideration is negatived; and this as truly with respect to the land north of the line as to that south of it. In both cases there was

simply a present cession, with a covenant for payment of the consideration thereafter, no mention being made of interest. Clearly, the provision of § 177, Judicial Code, is applicable: "No interest shall be allowed on any claim up to the time of the rendition of judgment thereon by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest."

It is contended, however, both as to the award for the excess land and as to another claim allowed, that as the jurisdictional act calls for the consideration of equitable as well as legal claims, the ordinary rule of equity ought to be followed as to the allowance of interest (*Himely* v. *Rose,* 5 Cranch, 313, 319, being cited). But the jurisdictional act cannot be regarded as taking the case out of the usual rule. *Tillson* v. *United States,* 100 U. S. 43, 46; *Harvey* v. *United States,* 113 U. S. 243, 249. Nor does *United States* v. *Old Settlers,* 148 U. S. 427, support the claim for interest; for there the particular question was a subject of difference in the negotiation that preceded the treaty; a clause of the treaty itself provided that it should be submitted to the Senate of the United States for decision; the Senate allowed interest; and its determination was accepted by the United States as valid and binding. This court held that the decision of the Senate was controlling, and that therefore interest must be allowed upon that part of the claim, to which it applied. See 148 U. S. 433, 449, 451, 452, 478.

The contention of claimant that the Court of Claims erred in not making a pecuniary award for the members of the Omaha tribe killed by the Sioux is covered by what we have said to show that there was error in making an allowance for the horses stolen by the Sioux; the same treaty provision governing both claims.

Other assignments are based upon the failure of the court to find certain facts in accordance with claimant's contention. These require no discussion, since our review is based upon the findings as made.

The judgment will be reversed as to the sum of $4,560 awarded for horses killed by the Sioux Indians, and in other respects affirmed.

*Reversed in part; affirmed in part.*

MR. JUSTICE MCREYNOLDS took no part in the consideration or decision of this case.