## PRINCE LINE, Limited, v. UNITED STATES.

## AMERICAN HAWAIIAN S. S. CO. v. SAME.

(District Court, E. D. New York. August 23, 1922.)

1. War ⬥14—Market price, notwithstanding abnormal conditions, held "just compensation" for use of piers requisitioned.

Under Lever Act Aug. 10, 1917, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ii), entitling owner of property requisitioned by the United States government to just compensation, owners of piers requisitioned for use of the government during the war period were entitled to recover as "just compensation" the amount of profit actually received by the government for the use of the piers, which amount was admitted to be a fair rental, considering the increased demand for and market value of these piers resulting from war conditions.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Just Compensation.]

2. War ⬥14—Owner of pier requisitioned entitled to just compensation, though it rented pier from government and made profit.

Where the government requisitioned a pier from the owner for war purposes, and owner rented part of it back from government and did business at a profit under Lever Act Aug. 10, 1917, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ii), the owner was entitled to just compensation for the pier requisitioned, notwithstanding that the granting of just compensation in the form of market value under war conditions would enable owner to make another profit.

3. War ⬥14—"Just compensation" held value at time of requisition.

Under Lever Act Aug. 10, 1917, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ii), entitling the owner of property requisitioned to just compensation, "just compensation" is the fair value in accordance with the law of supply and demand at the time of the taking.

4. United States ⬥110—Interest on claims against not allowed.

In the absence of statutory authority, interest cannot be allowed on a claim against the United States.

5. War ⬥14—Interest held recoverable on value of property requisitioned by government.

In an action against the United States, under Lever Act Aug. 10, 1917, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ii), to recover just compensation for property requisitioned by the government, interest on the value of the property is recoverable as a part of the award.

At Law. Separate actions by the Prince Line, Limited, and the American Hawaiian Steamship Company against the United States. Decree for plaintiff in each action.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Cletus Keating, of New York City, of counsel), for petitioners.

Ralph C. Greene, U. S. Atty., of Brooklyn, N. Y. (Frederick L. Kopff, Asst. U. S. Atty., of Brooklyn, N. Y., and Howard W. Ameli, of Washington, D. C., of counsel), for the United States.

### Prince Line, Limited.

CHATFIELD, District Judge. The plaintiff has brought an action against the United States under the provisions of section 10 .of the

Act of August 10, 1917, 40 Stat. p. 276 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ii), for an amount claimed as just compensation for the possession and use of what is known as Pier 4 of the Bush Terminal in Brooklyn, from May 18, 1918, until May 1, 1919.

The President, under the statute, fixed this item of just compensation at the sum of $32,100.02. Seventy-five per cent. of the last amount, namely, $24,075.02, was paid by the government and received by the Prince Line under protest. It also appears, from the pleadings and the testimony, that the Prince Line leased the outer third of this pier at the rate of $40,000 a year to the Booth Line during this entire period. The share of this rental for the time in question, namely, 347 days, amounted to $38,555.17.

During this entire period the government had possession of other docks and piers, including the entire Bush Terminal, in the harbor of New York, and as a matter of fact did not require, for government purposes, for the actual docking of vessels, this particular Pier 4, at the Bush Terminal. The Prince Line, as well as the Booth Line, desired to and did continue business in the forwarding of freight and passengers by steamships, and made an arrangement, which was not changed throughout the entire time, under which the Prince Line paid the United States, for the use of the pier which the President had requisitioned from the Prince Line, an average rate of $554.84 per day, totaling $203,531.52 for the period in question.

Assuming that the Prince Line, having made a lease to the Booth Line, could not change or repudiate its contract, the plaintiff contends that it is entitled to estimate, as just compensation for the entire pier, the amount which the government actually received during the 347 days, namely, $203,531.52 for the Prince Line portion, plus the amount of rental which was paid by the Booth Line, amounting to $38,555.17, or $242,086.69. From this it deducts the original long-term rental rate which the Bush Terminal Company was entitled to receive for the pier, amounting, for $347 days, to $67,470.68, and the actual operating expenses of the pier at the rate of $18.21 per day, amounting to $6,505.-30. Adding to these two items the $24,075.02 which has been paid by the government to the Prince Line, we have a total of credits amounting to $98,051.00. The balance, or $144,035.69, with interest from May 1, 1919, is claimed by the plaintiff upon the testimony introduced in the action.

The complaint originally called for a larger sum, based upon an estimated valuation, namely, $360,972.01; but the plaintiff's attorney, with commendable desire to simplify the issue, to claim nothing which was not definitely supported by the testimony, and to include no items to which he would not be plainly entitled upon the plaintiff's theory of the case, has modified the plaintiff's cause of action, with the above result. The government concedes that the balance unpaid upon the government's figures, namely, 25 per cent. of the amount fixed, with some increase allowed by the government experts, should be decreed to the plaintiff, but contests the balance of the claim and the allowance of interest.

American Hawaiian Steamship Company.

In this action the American Hawaiian Steamship Company sued to recover $458,100.01, with interest, as just compensation for the use of Pier 6 at the Bush Terminal, which, under the circumstances just recited in the case of the Prince Line against the United States, was taken over by the United States on the 9th of March, 1918, and turned back upon the 31st day of July, 1919, making a period of 510 days. During this period the United States used this particular pier and received no rent from the Russian Volunteer Fleet, which had been a subtenant of the American Hawaiian Steamship Company, at the rate of $945 per day, amounting to a total of $481,950.

Credit is allowed (1) for the basic rental to the Bush Company, which at the rate of $165,000 per year amounted to $233,748.30; (2) for operating expenses of the pier at the rate of $23.33 per day, amounting to $11,898.30; and (3) the amount actually received by the plaintiff from the government, namely, $23,849.99. This last amount was paid under the statute and represents 75 per cent. of the sum of $31,799.90, which the government fixed as fair compensation for the use of Pier 6 as above stated. The total of these credits is $269,496.59, leaving a balance claimed by the plaintiff of $212,453.41, with interest from July 31, 1919.

This action was originally brought for $458,100.01, based upon the estimated value of Pier 6 during this period; but, as in the Prince Line Case, the plaintiff and its counsel have limited their request for judgment to the exact amounts shown by the testimony to have been receivable by the government, and which amount the plaintiff claims the government should be satisfied to turn over to the plaintiff as fair compensation, for the period described.

The testimony in the case has, in substantially all instances, been introduced without contradiction of the exact figures or statement presented. The government has called experts, who have testified generally, giving valuations supporting the government's figures as to the reasonable rental value, under ordinary normal market conditions, of the piers in question. The plaintiff has not cross-examined these witnesses, beyond bringing out the fact that their estimates were based upon normal conditions. The plaintiff has put in testimony showing the reasonable rental value of the piers in question during the abnormal conditions resulting from the war, and based upon the demand for shipping facilities, which led, as was stated by the witnesses, shippers to pay anything which was demanded, within possible limitations, in order to secure berths for the immediate loading of ships. This abnormal market not only created such advances in leasehold values as to justify the opinions of the plaintiff's experts, but the testimony in the case shows that the Prince Line and the Booth Line, occupying Pier 4 and renting berthing space at the rate of $250 a day for the time of loading, or $125 a day for the time during which cargo was being received and dispatched, actually made a profit, and apparently from the testimony a considerable profit, over the price which was paid to the government for the use of the pier.

In the case of the American Hawaiian Steamship Company, the government did not relet the pier to the American Hawaiian Steamship Company, the plaintiff, nor continue the lease to the Russian Volunteer Fleet, but apparently, from the testimony, the Russian Volunteer Fleet in turn was entirely satisfied with the rental rate, and other shippers would have paid the United States the increased rental which the American Hawaiian Steamship Company had already demanded and begun to receive. After the pier was turned back, it brought $2,000 per day.

Conditions during the war have resulted in many charges of profiteering, or unlawful accumulation of profits. The so-called Lever Law, under a section of which this action was brought, attempted to provide a penalty and denounce as a crime the' hoarding of necessities, and the making of improper profits out of the necessities or abnormal conditions caused by the war. On the other hand, the government recognized that extraordinary profits could lawfully be made, and by excess and other income taxes undertook to see that the government received a fair share of what must have been considered by Congress legitimate profits. The inherent vice was not in the earning of tremendous profits, but in the unfair enjoyment by an individual of results from conditions created through the misfortunes of the people as a whole. The purpose of the income and war taxes was to secure to the people generally their share of individual benefits resulting out of the country's misfortune.

[1] The question in the cases at bar is not so much what mathematical result will be arrived at, or what computation will show, from the facts. The issue is what premises are to be assumed, and what facts may lawfully be made the basis of computation of damages in the case. "Just compensation," provided for by the statute, means something very different, when viewed from the standpoint of valuation under normal conditions, as distinguished from "just compensation," when viewed from the standpoint of abnormal times and demands. Whether the result is "just" from the standpoint of a third party may be something entirely different from the opinion found from the standpoint of the party either receiving or the party paying the amount in question. The United States government cannot lawfully claim compensation from facts which would render a private individual liable to criminal prosecution or to an action for fraud.

Section 4 of the Lever Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ff) has been held unconstitutional (U. S. v. Cohen Grocery Co., 255 U. S. 81, 41 Sup. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045), upon the principle that a mere excessive charge is not necessarily criminal when no standard is established. But a correct principle, equitable and legal, is invoked by the plaintiff in the present case, if the United States would be unjustly enriched at the expense of the plaintiff through profit it made by means of compulsory dealings under the law of eminent domain. If the United States deliberately compelled a party to surrender property, and then intentionally, through the creation of a monopoly in its favor, compelled that party to take back the product at a fictitious or abnormal rate, such deliberate action

would be speculation and profiteering on the part of the government, with an element of bad faith involved which would go far to prove the injustice of the compensation which in violation of constitutional rights was forced upon the plaintiff.

The plaintiff nowhere in this action charges the government with such deliberate or intentional fraud, but it does charge that the demands of the government failed to compensate or pay it such a sum of money as would be "just," when viewed from the standpoint of what the government charged the plaintiff for use of the same property. No amount of good intention on the part of the government's servants, or zealous care for the public revenue, will excuse or serve as a defense against a positive wrong inflicted by the government itself. If the government, through the taking of the plaintiff's property at less than "just" compensation, actually received more money for the use of the property than it paid, with no lapse of time or changed conditions, the plaintiff has a right to ask that its compensation be increased, so as to receive the actual amount of profit received by the government, which is admittedly fair in amount, and which would in no way convict the plaintiff of the charge of profiteering. This amount was actually fixed by one of the government's witnesses as a fair rental for the government's own property.

It therefore appears that the issue in this case does not depend upon the prices charged by the government. That would be no more relevant than if the plaintiff had rented a pier in the North River, or had bought sugar from the government at a high price after having had some sugar commandeered at a low price. The question is what standard or market value is to be used as a basis of fixing "just compensation." This brings us directly to the question of what is market value, or rather from what standard market value should be judged.

In the case of Benedict v. United States (D. C.) 271 Fed. 714, affirmed (C. C. A.) 280 Fed. 76, land taken by the United States during the period of the war was valued at its market value at the time taken. In Gulf Refining Co. v. United States and Borland and Emerson v. United States, decided June 12, 1922, in the United States Court of Claims, compensation was awarded to claimants for vessels taken by the government, at the market value of the ships when taken. In each of these three cases, increased demand and market value was the result of war conditions, and certainly the constitutional authority of the government to take property and to render just compensation therefor means that the government should pay a fair valuation for that of which the party owning the property is deprived. The measure of such deprivation must, of course, be estimated at the time when the deprivation occurs. National City Bank v. U. S. (D. C.) 275 Fed. 855. But this deprivation must be measurable in dollars and cents as a commodity. U. S. v. New River Collieries Co. (C. C. A.) 276 Fed. 690. In the case of property which cannot be bought and sold as a matter of common commercial usage, but which the owner is holding because of some peculiar circumstance giving him a monopoly or corner through which the price may be run up, or where the need is unique, then market value cannot be estimated from the standpoint of the ex-

tortionate price which may be demanded. U. S. v. Boston, C. C. & N. Y. Canal Co. (C. C. A.) 271 Fed. at page 893. ·

As a matter of fact, in the present instance, the Prince Line would have been in the same position if the government had taken Pier 4 of the Bush Terminal, and the Prince Line had thereupon secured a dock at some other place at greatly increased rental, but had, fortunately for it, been able to rent berths and load steamships at such high prices as to make a net profit on the entire transaction.

[2] If the Prince Line recovers from the government only the amount which the government has fixed, it nevertheless has done business at a profit, both on the lease of Pier 4 and on the pier which it rented from the government for its current needs during the war. To allow the Prince Line to make a profit from the government for the use of the pier, over the rental to the Bush Terminal, and also to make a profit from the pier which it temporarily rented from the United States, will put some excess profits in the hands of the Prince Line, and this will be at the expense of the taxpayers, unless the nature of the income tax paid by the Prince Line should bring a large part of these profits back to the government. But the contention of the government that this must be prevented by refusing to allow the plaintiff to obtain "just compensation" in the form of market value under war conditions does not follow. There was a market and a market value, and no extortion has been shown. Monongahela Navigation Co. v. U. S., 148 U. S. 312, 13 Sup. Ct. 622, 37 L. Ed. 463.

When we come to the American Hawaiian Company, the situation is slightly different. The American Hawaiian Company was not deprived of the use of a pier, nor did it obtain another pier and actually make a profit from the use of the new pier. It had already made a lease at a profit, and merely lost a tenant, which was taken over by the United States, which received the profit. It cannot say that the government has profited illegally or improperly in earning all the revenue from the pier which it could obtain. The only thing that it can complain of is that the government has not paid market value for the pier which it took.

We come back, therefore, to the question with which the discussion started: What was market value in the one case on the 18th of May, 1918, and in the other case on the 13th of March, 1918? Undoubtedly, ordinary fair market value can be determined only by what the property will bring in the market, when no element of monopoly or extortion enters into the matter. If, during war time, prices and values go up, but there is still an open market, and properties are disposed of at market value, then it is a mere juggling of terms to contend that market value means value in a different market than that at which the property is to be disposed of.

[3] As was said in cases cited supra, the government cannot take private property without making just compensation, and just compensation is to be estimated by the value to the person at the time of the taking. Unless the government could properly say that all persons in the United States were to furnish the government property, supplies, and services at a pre-war price, and unless the government could con-

stitutionally stamp as illegal all prices which, due to competition caused by the war, had increased in value, then just compensation would be a fair price in accordance with the laws of supply and demand at the time. From this standpoint, the demands of the plaintiffs in each of these cases are not only fair and just, but within the limits which have easily been established as fair market value. It has been shown that there was a market, and the plaintiffs should recover the amount asked.

[4, 5] Interest cannot be allowed on a claim against the United States, in the absence of statutory authority. U. S. v. Gleeson, 124 U. S. 255, 8 Sup. Ct. 502, 31 L. Ed. 421; U. S. v. N. C., 136 U. S. 211, 10 Sup. Ct. 920, 34 L. Ed. 336; U. S. v. Omaha Tribe, 253 U. S. 275, 40 Sup. Ct. 522, 64 L. Ed. 901; U. S. ex rel. Angorica v. Bayard, 127 U. S. 256, 8 Sup. Ct. 1156, 32 L. Ed. 159; Scully v. U. S. (D. C.) 197 Fed. 327. But in the Benedict Case, supra, the Court of Appeals for this Circuit expressly holds that interest in condemnation proceedings under the Lever act is a part of the award or compensation. Interest must therefore be considered as awarded by statute in these cases from the date of taking over by the United States.

Decrees accordingly.