# 𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫.

## APPALACHIAN POWER .COMPANY v. CLARENCE H. JOHNSON.

### September 20, 1923.

1. EMINENT DOMAIN—*Assessment of Damages—Principles upon which Damages are Determined—Whether Property has a Present Fair Market Value.*—In eminent domain proceedings where the property and property rights proposed to be taken have a present fair market value, that value, at the time of the taking, is the "just compensation" to which the owner is entitled under the constitutional provisions on the subject, and is the measure of the award the commissioners should make to the owner therefor; and not the value after future development of the property, or in the vicinity of it, has been made.

2. EMINENT DOMAIN—*Assessment of Damages—Principles upon which Damages are Determined—Future Apprehended Damages.*—In eminent domain proceedings future apprehended damages due to negligent construction or operation of the works of the condemnor cannot, as such, be legally included in the award of the commissioners; for the law furnishes a remedy in the future for the recovery of all such damages, and the right to such recovery is not at all affected by the condemnation proceedings.

3. EMINENT DOMAIN—*Exceptions to Report of Commissioners—"Good Cause be Shown Against the Report."*—On the question which arises under section 4359 of the Code of 1919, upon exceptions to the report of the commissioners in condemnation proceedings, of whether "good cause be shown against the report," the main thing to be determined, there being no proof of bias or prejudice on the part of the commissioners, is whether or not the award was arrived at through a misconception of the principles of law which should have governed them in their action.

4. EMINENT DOMAIN—*Exceptions to Report of Commissioners—"Good Cause be Shown Against the Report"—Case at Bar.*—In the instant case where on exceptions to the report of the commissioners in condemnation proceedings, the question was whether good cause had been shown against the report, it appeared from the testimony of the commissioners that four of them arrived at the award made through a misconception of their right to allow future apprehended damages

due to negligent construction or operation of the works of the condemnor, and the fifth arrived at such award through a misconception of the rule that a present fair market value at the time of the taking is the "just compensation" contemplated.

*Held:* That as the award was arrived at through a misconception of the principles of law, the exceptions should be sustained.

5. EMINENT DOMAIN—*Award of Damages by Commissioners—Future Development of Property Taken—Case at Bar.*—Where from the testimony of a commissioner on exceptions to the commissioners' report in eminent domain proceedings, it was evident that he based his award not upon what he considered was the present fair market value of the property, but upon what would be such value when an adjacent town might, in the indefinite future, build out to the property, it is evident that the commissioner did not have in mind the principle of law that the present fair market value of the property at the time of the taking is the just compensation to which the owner is entitled.

6. EMINENT DOMAIN—*Award of Damages by Commissioners—Damages for Future Negligent Construction or Operation—Case at Bar.*—On exceptions to the commissioners' report in eminent domain proceedings instituted by a power company for the condemnation of a right of way for their power line, four of the five commissioners testified that they were induced to make the award chiefly by the consideration that the power line might in future break down and injure persons and property.

*Held:* That as it was manifest that four of the commissioners allowed a part, at least, of the damages awarded in order to cover future damages, the exceptions should be sustained.

7. EMINENT DOMAIN—*Damages—Fair Market Value—Extension of nearby Town to the Property.*—In eminent domain proceedings, if the prospect of a town building out to the property in question had in fact had an effect upon the present fair market value of the property proposed to be taken, or, if the prospect of such improvement was so reasonably expected in the immediate future that it could be estimated with reasonable certainty what was the present fair market value of the property, in view of such prospect, the commissioners could have properly taken into consideration such expected development.

8. EMINENT DOMAIN—*Damages—Existing wants of a Community.*—Existing wants of a community, or such as may be reasonably expected in the immediate future, may be taken into consideration by commissioners in eminent domain proceedings in arriving at the fair market value of the property proposed to be taken for public use.

9. EMINENT DOMAIN—*Damages—Varied Elements of Value—Present Use of the Property and Uses to which it is Adaptable.*—In eminent domain proceedings upon the question of the value of the property taken, the true rule seems to be to permit the proof of all the varied elements

of value. In this connection, the owner is entitled to have the commissioners informed of all the capabilities of the property, as to the business or use, if any, to which it has been devoted, and of any and every use to which it may reasonably be adapted or applied. And this rule includes the adaptation and value of the property for any legitimate purpose or business, even though it has never been so used and the owner has no present intention to devote it to such use.

10. Eminent Domain—*Damages—General and Special Uses of Property.*— In estimating the value of the property taken in eminent domain proceedings, it is the present actual value of the land, with all its adaptations to general and special uses, and not its prospective or speculative or possible value, based upon future expenditures and improvements, that is to be considered.

11. Eminent Domain—*Damages for Property Taken—Future Damages.*— While commissioners in awarding damages for property taken in eminent domain proceedings for a power line may not consider future apprehended damages due to negligent construction or operation of the power line, they can properly take into consideration the effect of the fear of the line breaking down and injuring persons and property, whether due to inherent defects or unavoidable accidents, not to be guarded against by reasonably skillful construction and careful operation, or perhaps, indeed, even where due to negligent construction or operation, if the liability to such injury in fact depreciated the market value of the property.

12. Eminent Domain—*Award of Commissioners—Conclusiveness of Award.*— In eminent domain proceedings the finding of the commissioners appointed to assess damages is not to be disturbed unless shown to be erroneous by clear proof; or in the words of the statute, unless "good cause be shown against it." The commissioners' report, if no illegality or irregularity appears on its face, is at least *prima facie* evidence of the propriety and correctness of the award.

13. Eminent Domain—*Report of Commissioners—Confirmation—Case at Bar.*—In the instant case, an eminent domain proceedings, if the award of damages had been made upon consideration of the proper legal principles, the testimony of a witness, although indirectly bearing on the subject of the fair market value of what was taken, might have warranted the court below in confirming the report. But as the award appeared not to have been based on correct principles, and as, under the eminent domain statute, the condemnor, as well as the condemnee, is entitled to have an award of commissioners based on such principles, the report should not have been confirmed over the objection and exceptions of the condemnor.

Error to a judgment of the Circuit Court of Giles county, in eminent domain proceedings. Judgment for the condemnee. The condemnor assigns error.

*Reversed and remanded for further proceedings.*

This is a condemnation proceeding, under the eminent domain statute, instituted by the Appalachian Power Company, the plaintiff in error (hereinafter called the power company), for the condemnation through the land of the defendant in error (hereinafter called the defendant landowner), a tract of farming land consisting of 223 acres, of a perpetual right of way for an electric power transmission and telephone line, with the right to cut and trim any trees which may interfere with the safety or proper operation of said line, * * * with right of access thereto at all reasonable and proper times for the purpose of patrolling, repairing and maintaining the same and of removing the property of the power company and its successors—the centre line of such right of way extending for a distance of 2,661 and 1-10th feet through said land, with five (5) steel towers, or poles, approximately fifty feet high, thirteen feet square at the base, firmly attached to the ground, located at intervals along said line upon such land, for the support of the wires strung on such towers above such right of way for the transmission of electric current to be used for light, heat, power and telephone purposes.

By order of the court below, five commissioners were regularly appointed, any three or more of whom might act, to view the premises, who were directed by the order to ascertain and report to the court what would be a just compensation for the land and rights proposed to be taken by the power company for its aforesaid purposes and the other resulting damages, if any, to the residue of the property of the defendant owner, etc.

All five of the commissioners acted, met and viewed the premises at the time named in the aforesaid order, and made their report in writing to the court substantially in the form required by law, dated that day, in

which they reported in substance that they were of opinion and ascertained that for the land and rights proposed to be taken as aforesaid they awarded the sum of $2,500 as just compensation, and that they found that the damages to the adjacent or other property of the defendant owner and to the property of other persons who would be damaged in their property "by reason of the construction and operation of the works of said company, beyond the peculiar benefits that will accrue to such property from the construction and operation of such works are *nothing*."

The power company excepted to this report and objected to its confirmation for the following reasons:

"1. The amount fixed by the commissioners, $2,500.00, is far in excess of the value of the land taken and the easement, privileges, etc., sought to be condemned.

"2. The commissioners, while considering the question of damages, allowed the landowner, C. H. Johnston, to introduce testimony over the protest and objection of the applicant, Appalachian Power Company, that was irrelevant and illegal, in that a witness testified that he had heard someone say that in a remote county, on one occasion, a power line had fallen and killed livestock, without fixing any date, any amount, the character of the line, the manner of construction or any data upon which the Appalachian Power Company could formulate or present any evidence to contradict this hearsay and vague statement.

"3. The commissioners allowed evidence as to the probable future value of land taken, and easement, privileges, etc., granted, based upon probabilities of laying off of town lots and selling the same, the value of which would probably be fixed by reason of the probable extension of the Narrows branch of the Norfolk and Western Railroad, thus rendering it possible that

this land would be wanted by the said Norfolk and Western Railroad in the remote and indefinite future for terminal purposes."

On the hearing upon said report, and the exceptions thereto (which was on September 28, 1922), the power company introduced only two witnesses. One of such witnesses, the engineer of the power company, charged with the duty of locating its transmission lines and who located the line in this proceeding mentioned through the land of the defendant owner, testified, so far as material to be mentioned, in substance as follows:

That the aforesaid land of the defendant owner is devoted to and used only for farming purposes. That the land is on the north side of the New River, Holston and Western Railroad, the line of such railroad being between the land and Wolf creek. That Wolf creek runs between the land and the town of Narrows. That there is no bridge across Wolf creek giving access to this land over such creek, other than a small foot bridge at some distance down the stream. That it would cost at least ten thousand dollars to build a bridge across the creek giving access to this land and that the land is practically inaccessible to the town of Narrows.

That the line proposed to be constructed through the said land would consist of uninsulated copper wires, strung on the steel towers, to be about forty-five feet from the ground, with the telephone wire about thirty-five feet above ground. That the line will be constructed in the most approved and substantial manner "with _____ inch copper wires" carried on the aforesaid steel towers. That there was a possibility of the breaking of the line in times of unforeseen heavy sleets, but no probability that such breakage would occur.

That on the view there was offered before the com-

missioners by the defendant "evidence of certain acci-
dents to persons and live stock on other electric lines
by broken wires and otherwise; that there was also
offered statements of certain witnesses that there was a
probability or possibility of the Norfolk and Western
extending the New River, Holston and Western line from
its present terminus at Rocky Gap, in Bland county,
to some point in Tazewell, and that this land would be
available for terminal purposes, and none other so avail-
able; that the defendant offered evidence that at some
future time he would probably want to divide part of
the land through which this transmission line runs into
building lots, said land being near the town of Narrows;
that to the introduction of such evidence, and all of it,
the Appalachian Power Company, by counsel, objected,
but the said evidence was received and heard notwith-
standing the objection thereto."

The other witness for the power company, its super-
intendent, testified in substance, so far as material to
be mentioned, as follows:

That he was familiar with the said land and the value
of said right of way or the amount that should be paid
therefor. That the land is exclusively agricultural land.
That the actual value of the land to be taken would be
about $20.00. That the value of the timber to be cut
and the damage to fruit trees over which the line will
pass would be about $10.00. That the damage that
would be occasioned in the process of construction
would be about $15.00. That the line when constructed
will not interfere with the usual use and occupation of
the land, and the residue would not be injured in any
way, being used exclusively for agricultural purposes.

That the line would be constructed according to the
best known methods of constructing a line of this kind
and as substantially as reasonably possible to construct

such a line; that the wires would be all far enough above the fruit trees, through which they would pass, so as to cause no damage whatever thereto. That the breaking of any of the wires was a very remote possibility.

That after the line is constructed the right of way will not be used except for the purpose of patrolling the line once in every ten days or two weeks and making the necessary repairs thereto, which would be infrequent.

That there already exists on said land an electric light and power transmission line running parallel to and about forty feet from the line proposed to be constructed by the Appalachian Power Company, which has been and is now operated by the Giles Power Company; that such line is much more dangerous than the said proposed line will be, among other reasons, because it is built on wooden poles, the wires being not nearly so high from the ground, and much more liable to break than are the wires of the said proposed line.

That the witness was present and heard the testimony offered before the commissioners by the defendant owner in reference to the probability of the extension of the line of the railroad and in reference to the future possibility of the defendant's dividing his land up into lots, set out in the aforesaid testimony of the engineer of the power company; and that the witness heard the objection of counsel for the power company to receiving of such evidence, but that such evidence was received by the commissioners notwithstanding said objection.

Thereupon the defendant owner introduced the testimony of the five commissioners, the testimony of himself and the testimony of another witness, one J. E. Hopkins, all of which was as follows:

"*Evidence for the Defendant.*

"J. T. S. Hoge, a witness,   *   *   *   testified that he was one of the commissioners in this case who went

upon the land of the defendant pursuant to the order entered herein.

"That he heard the statements of the witnesses offered on behalf of the defendant concerning the killing of some live stock on some other electric line in another State, but that he did not realize that such statements was evidence.

"That he heard the testimony of witnesses, offered by the defendant over the objection of counsel for the power company, as to the probable use to which the land would be put in the event of the Narrows branch of the Norfolk and Western Railroad Company being extended and of this land being possibly required for terminal purposes; that he also heard the evidence of witnesses, introduced on behalf of the defendant over the objection of counsel for the power company, that the land through which said line was proposed to run might be cut up into town lots, the future sale of which might be injured by the construction and operation of said line; that none of said evidence influenced him in making up his judgment in the matter, and that his reason for awarding $2,500.00 in the case, as set out in the return signed by him, was that the town of Narrows might hereafter build out to this property, and that the power line would be a lifetime proposition, and that he considered that the farm would be worth $2,500.00 less with this power line through it.

"On cross-examination the witness testified that the commissioners arrived at the sum of $2,500.00 by each one writing down his figures and then taking the average of the amount so written down.

"That on considering the matter he understood and based his judgment upon the fact that the right of way would be a strip running through said land 100 feet wide; that he did not know the market value of the land

and did not consider that the line would interfere with the use of the residue of the land for farming purposes.

"L. J. McGehee, another witness, * * * testified that he was one of the commissioners who went upon the land of the defendant on the 17th day of July, 1922, pursuant to the order of the court herein; that he heard the statements of the defendant as to a proposed development of his property at some future time by dividing it into town lots, and that he also heard statements to the effect that there was a probability of the railroad above referred to being extended beyond the present terminus at Rock Gap, and the possible need of this land for railroad terminal purposes; that he did not consider any of this evidence in making up his judgment in this matter.

"That he did not know how much land was being taken, and that the principal reason he agreed to $2,500.00, as set out in his report, was that live stock and people might be killed and property might be injured by the operation of the line.

"That he did not know what the land was worth, but supposed that it was worth about $100.00 an acre for farming purposes.

"C. E. McGinley, another witness, * * * testified as follows:

"That he was one of the commissioners who went upon the land herein involved on the 17th day of July, 1922, pursuant to the order of the court herein.

"That he heard the statements of various witnesses about a cow being killed on some other electric line in some other State, and about the probability of a part of the Johnson land being needed for railroad purposes, but none of said statements influenced him in making up his judgment in this matter.

"He did not know what the land was worth, and that

none of it had been divided into town lots, and there was no bridge across Wolf creek by which said land could be reached from the town of Narrows except a swinging foot bridge across the creek a short distance below the Johnson lands.

"The witness further testified that the line proposed to be constructed by the petitioners would be of no particular damage to the land of the defendant Johnson after it was put up, if it did not break down, except the going on and over the land by the agents of the petitioner whenever and however they choose and keeping the trees cut back; that the principal thing in his mind in fixing the amount set out in his report was the constant uneasiness or fear that the line would break down some time and might kill somebody or some stock or might do some injury to other property.

"G. F. Straley, another witness, * * * testified that he was one of the commissioners who went upon the defendant's land pursuant to the order of the court herein; that he heard the various statements made by the defendant and his father in the course of the hearing before him, about accidents on other electric power lines, about the probability of the defendant's land being hereafter required for railroad terminal purposes in case of the possible extension of the Narrows branch of the Norfolk and Western Railroad, and also the probability of the defendant at some time cutting this land up into lots and selling the same, but that none of these statements influenced him in making up his judgment in this matter, and that he considered that the farm might be worth $2,500.00 less money with this power line through it.

"On cross-examination the witness stated that he considered that a line of this kind would be a nuisance and that the principal thing that influenced him in making

the award of $2,500.00 was the constant anxiety and fear that the line would break down or kill or injure persons or live stock or do some other injury; that the bottom land through which the proposed line would run is worth from $160.00 to $200.00 per acre for trucking purposes, and that there would be only one structure on the bottom land, that if the power company was liable for future damages for negligence he supposed that the sum awarded would be somewhat high.

"R. H. Woods, another witness, * * * testified as follows:

"That he was also one of the commissioners who went upon the land on the 17th day of July, 1922, pursuant to the order of the court herein, that while he heard the evidence referred to in the testimony of the other witnesses herein, and the objections of counsel for the power company hereto, such evidence did not influence him in making up his judgment in this matter; that what he considered more than anything else was the fear of the line breaking down and injuring persons or property.

"J. E. Hopkins, another witness, * * * testified as follows:

"That at one time he offered the defendant Johnson $18,000.00 for the farm through which the proposed line runs; that he would not want it at all with the power line constructed through it.

"That if he owned it he would not have the line through it for $2,500.00 and that he thought it would diminish the market value of the place by that amount; that what he wanted it for was to sell a part of it into lots.

"Clarence H. Johnson, the defendant, another witness, * * * testified as follows:

"That he is the owner of the land through which the

line proposed to be constructed runs; that it is a tract of farming land containing about 223 acres; that he was offered $22,000.00 for the land, and offered it to J. E. Hopkins for $20,000.00 as it then stood, but since that time has added somewhat to the acreage. He thought he ought to have $5,000.00 damage for the right of way for the petitioner's power line as laid out; that he contemplated having part of the land laid out in town lots, and had at one time a rough draft of a plot or plan made of it, but no actual map had ever been made and no lots had ever been offered for sale.

"That the proposed line would be between his dwelling house and the main part of the town of Narrows, would run about 300 feet from his dwelling and about 200 feet from the tenant's house on his place; that it would also pass over a part of his orchard in which there was no structures.

"On cross-examination the witness stated that he paid about $9,000.00 for the 203 acres of this land several years ago; that he has since bought twenty acres more, and did not remember the price he paid for the twenty acres; that he had since its first purchase improved the land in respect to the buildings thereon and the clearing up of a part thereof.

"That the present transmission line now running through his place and operated by the Giles Power Company was constructed some years ago and has been since in continuous operation; that it was constructed and in operation at the time he tried to sell his land for $22,000.00 and at the time he was offered $18,000.00 therefor.

"That when he was first approached about the matter by Mr. Phelps, representing the power company, which was sometime last spring, he agreed to take $250.00 for the right of way for this line through his

lands to be constructed on five steel towers as shown on the map filed herein; that afterwards he increased his price, and on the 27th of March, 1922, he wrote a letter to Martin Williams, Sr., one of the attorneys for the Appalachian Power Company, in which he agreed to take $1,000.00 in full for the right of way and all damages, but subsequently refused that and demanded $5,000.00. Witness was here shown a letter which is filed as evidence in the cause * * * (the letter to Mr. Williams), but he stated that after this letter was written and after further consideration of the matter, he concluded that his damage would be much more than he then thought it would be."

Thereupon the power company moved the court "to sustain the exceptions filed to the report of the commissioners returned herein, and further moved the court to set aside said report and appoint other commissioners;" but the court overruled such motions, refused to sustain any of said exceptions, and entered the order under review, which confirmed the said report.

*Robert E. Scott* and *Martin Williams*, for the plaintiff in error.

*W. B. Snidow*, for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

So far as necessary for the decision of the case, the questions raised by the assignments of error will be disposed of in their order as stated below.

1. Does it appear from the evidence that the award of the commissioners in the instant case was arrived at through a misconception of the principles of law which should have governed them in their action?

The question must be answered in the affirmative.

There are two principles which should govern commissioners in assessing the damages for the property and property rights proposed to be taken in a condemnation proceeding.

[1] First. Where the property and property rights proposed to be taken have a present fair market value, that value, at the time of the taking, is the "just compensation" to which the owner is entitled under the constitutional provisions on the subject, and is the measure of the award the commissioners should make to the owner therefor; and not the value after future development of the property, or in the vicinity of it, has been made. *R. & M. R. R. Co.* v. *Humphreys*, 90 Va. 425, 18 S. E. 901; *Richmond & P. Electric R. Co.* v. *Seaboard, etc., Co.*, 103 Va. 399, 49 S. E. 512; *Swift* v. *Newport News*, 105 Va. 108, 52 S. E. 821, 3 L. R. A. (N. S.) 404; *Tidewater R. Co.* v. *Cowan*, 106 Va. 817, 56 S. E. 819; *Hunter* v. *C. & O. Ry. Co.*, 107 Va. 158, 59 S. E. 415, 17 L. R. A. (N. S.) 124.

[2] Second. Future apprehended damages due to negligent construction or operation of the works of the condemnor cannot, as such, be legally included in the award of the commissioners; for the law furnishes a remedy in the future for the recovery of all such damages, and the right to such recovery is not at all affected by the condemnation proceeding. *Alloway* v. *Nashville*, 88 Tenn. 510, 13 S. W. 123, 8 L. R. A. 123; *Central Georgia Power Co.* v. *Mays*, 137 Ga. 120, 72 S. E. 900.

[3, 4] On the question which arises under the statute (Code, section 4369), upon exceptions to the report of the commissioners in a condemnation proceeding, of whether "good cause be shown against the report," in *Tidewater R. Co.* v. *Cowan, supra* (106 Va. at p. 824, 56 S. E. at p. 821), this is said: "The main question in

all such cases, there being no proof of bias or prejudice on the part of the commissioners, is whether or not the award was arrived at through a misconception of the principles of law which should have governed them in their action." And we think that it clearly appears from the testimony of the commissioners in the instant case that four of them arrived at the award made through a misconception of the *second,* and that the fifth commissioner arrived at such award through a misconception of the *first* principle of law above stated.

[5] The latter commissioner testifies expressly that his "reason for awarding the $2,500.00 in the case * * * was that the town of Narrows might hereafter build out to this property, * * * and that he considered that the farm *would be* worth $2,500.00 less with this power line through it." (Italics supplied.) This statement, when read along with the other testimony of this witness, plainly shows, as we think, that he did not have in mind the principle first above stated and was not governed thereby in making the award. He evidently based his award not upon what he considered was the present fair market value, but what would be such value when the town of Narrows might, in the indefinite future, build out to the property.

[6] The four other commissioners testified that they were induced to make the award chiefly by the consideration that the line might in future break down and injure persons and property; and one of them testified "that if the power company was liable for future damages for negligence he supposed that the sum awarded would be somewhat high"—showing, as it seems manifest, that four of the commissioners allowed a part, at least, of the damages awarded in order to cover future damages which might be occasioned by the negligence of the Power Company or its successors; and that they

did not have in mind and were not governed by the second principle above stated in making the award.

[7, 8] It is true that if the prospect of the town of Narrows building out to the property in question had in fact had an effect upon the present fair market value of the property proposed to be taken (that is, upon its fair market value at the time of the proposed taking), or, if the prospect of such improvement was so reasonably expected in the immediate future that it could be estimated with reasonable certainty what was the present fair market value of the property, in view of the use for which it was naturally adaptable under the circumstances which were then reasonably expected to be brought about, not in the remote, but in the immediate future—the commissioners could properly have taken into consideration, in estimating the damages, such expected development of the town of Narrows. That is to say, existing wants of a community, or such as may be reasonably expected in the immediate future, may be taken into consideration by the commissioners in arriving at the fair present market value of the property proposed to be taken for public use. *Boom Co.* v. *Patterson*, 98 U. S. 403, 25 L. Ed. 206; 2 Lewis on Em. Dom. (3d ed.) secs. 706 (478), 707 (479); *Central Georgia Power Co.* v. *Mays, supra* (137 Ga. 120, 72 S. E. 900, at p. 902).

In *Boom Co.* v. *Patterson, supra,* (98 U. S. 403, 25 L. Ed. 206), in the opinion of the Supreme Court, this is said:

"In determining the value of land appropriated for public purposes, * * * the inquiry * * * must be what is the property worth in the market, viewed, not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted; that is to say, what it is

worth from its availability for valuable use.   Property is not to be deemed worthless because the owner allows it to go to waste, or regarded as valueless because he is unable to put it to any use.   Others may be able to use it, and make it serve the necessities or conveniences of life.   Its capability of being made thus available gives it a market value which can be readily estimated.

"So many and varied are the circumstances to be taken into account in determining the value of property condemned for public purposes, that it is perhaps impossible to formulate a rule to govern its appraisement in all cases.   Exceptional circumstances will modify the most carefully guarded rule; but, as a general thing, we should say that the compensation to the owner is to be estimated by reference to the uses for which the propety is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future."   See to the same effect, *Baltimore, etc., R. Co.* v. *Bonafield,* 79 W. Va. 287, 90 S. E. 868; 20 C. J., sec. 229, p. 774.

[9]   As said in 2 Lewis on Em. Dom., *supra* (sec. 706): "Generally speaking the true rule seems to be to permit the proof of all the varied elements of value; that is, all the facts which the owner would properly and naturally press upon the attention of the buyer to whom he is negotiating a sale and all other facts which would naturally influence a person of ordinary prudence desiring to purchase.   In this connection, the owner is entitled to have the jury" (the commissioners under our practice) "informed of all the capabilities of the property, as to the business or use, if any, to which it has been devoted, and of any and every use to which it may reasonably be adapted or applied.   And this rule includes the adaptation and value of the property for any legitimate purpose or business, even though it has

never been so used and the owner has no present inten-
tion to devote it to such use.

"It is said in some cases that it is proper to consider
every element of value which would be taken into con-
sideration in a sale between private parties. But this
needs some qualification, since remote and speculative
reasons are often urged by the seller in support of the
valuation claimed. Some cases say the owner is en-
titled to the value of the property for the highest and
best use to which it is adapted. This is true, in so far
as such adaptation affords the market value. But the
proper inquiry is, not what is the value of the property
for the particular use, but what is it worth in the mar-
ket, in view of its adaptation for that and other uses."

[10] As said in *Richmond, etc., R. Co.* v. *Seaboard,.
etc., Co., supra* (103 Va. 399, 49 S. E. 512): "It is the
present actual value of the land, with all its adapta-
tions to general and special uses, and not its prospective
or speculative or possible value, based upon future ex-
penditures and improvements, that is to be considered."

As said in *Hunter* v. *C. & O. R. Co., supra* (107 Va.
167, 59 S. E. 418, 17 L. R. A. [N. S.] 124): "* * *
the established rule of this court, recognized and ap-
proved by textwriters and by the Supreme Court of the
United States, is that the full and perfect equivalent for
the property taken in proceedings of this character is
what the law contemplates as the market value there-
of * * *."

We will say, by way of parenthesis, that we do not
deal with the subject of how the value of the property
should be determined when it has no fair market value,.
as that question is not involved in the suit before us.

[11] It is also true that the commissioners could have
properly taken into consideration the effect of the fear
of the line breaking down and injuring persons and

property, whether due to inherent defects or unavoid-
able accidents, not to be guarded against by reasonably
skillful construction and careful operation (*Alloway* v.
*Nashville, supra,* 88 Tenn. 510, 13 S. W. 123, 8 L. R. A.
123); or perhaps, indeed, even where due to negligent
construction or operation, if the liability to such injury
in fact depreciated the market value of the property. 2
Lewis on Em. Dom., sec. 740 (497); and *Leroy, etc., R.
Co.* v. *Ross,* 40 Kan. 598, 20 Pac. 197, 2 L. R. A. 217
and note.

But the testimony of the commissioners leaves the
distinct impression upon us that they did not have in
mind the vital distinction above referred to, that they
could properly consider the evidence as to the future
growth of the town of Narrows, or as to the fear of the
line breaking down and injuring persons and property,
only in so far as such evidence affected the present fair
market value of the property and property rights pro-
posed to be taken; and that, in truth, they were not
governed at all in making the award by a consideration
of the present fair market value of the property—the
true and only standard by which they should have been
guided, since, as in the instant case, the evidence dis-
closes, without conflict, the property and property
rights in question had such a value.

The testimony of the witness Hopkins was not be-
fore the commissioners, so far as the record discloses,
and three of the commissioners testified expressly that
they had no knowledge of the market value of the land.

[12] By nothing that we have said do we intend to
affect in the slightest degree the rule, uniformly followed
in this jurisdiction, that the finding of the commission-
ers "is not to be disturbed unless shown to be erroneous
by clear proof." *Richmond, etc., R. Co.* v. *Seaboard,
etc., Co., supra* (103 Va. 399, 49 S. E. 512), and cases

therein cited. As said in *Crawford* v. *Valley, etc., R. Co.,* one of the cases so cited (25 Gratt. [66 Va.] 457): "We hold it to be clear and unquestionable, under the plain mandate as well as the spirit of the statute, that the report of the commissioners, ascertaining the amount of compensation and damages to be paid to the land-owner, must be confirmed by the court, and judgment entered for the amount reported, unless, in the words of the statute 'good cause be shown against it.' This makes the commissioners' report, if no illegality or ir-regularity appears on its face, at least *prima facie* evi-dence of the propriety and correctness of the award, * * * and that award must, therefore, stand as the judgment of the court, or, rather the judgment of the court must accord therewith, unless some sufficient mat-ter be established to vary or arrest it."

As said in *Hunter* v. *C. & O. Ry. Co., supra* (107 Va. 158, 172, 59 S. E. 415, 420, 17 L. R. A. [N. S.] 124): "* * * the award of the commissioners (is) made upon evidence before them at the time, aided, and greatly aided, in the majority of cases by the evidence of their own senses, they having the advantage of see-ing the property itself * * * and judging of its value."

It appears, however, from the testimony of the com-missioners in the instant case, given within a very short time after their award (within a little over two months, when the subject must have been still fresh in their minds), that they were not aided by the view, nor, in-deed, by any testimony they heard or by any knowl-edge of their own on the subject, in coming to any de-cision as to the fair market value of the property, as they showed by their testimony their entire lack of in-formation on that subject, after the view had been had and the evidence introduced before them had been heard by them. All of which strengthens the aforesaid

conclusion, forced upon us by the evidence, that the commissioners were not guided by the legal standard in making their award.

[13] If the award had been made upon consideration of the proper legal principles aforesaid, the testimony of Hopkins, although only indirectly bearing on the subject of the fair market value of what was taken, might have warranted the court below in confirming the report. But as the award appears not to have been based on correct principles, and as, under the eminent domain statute, the condemnor, as well as the condemnee, is entitled to have an award of commissioners based on such principles, the report should not have been confirmed over the objection and exceptions of the power company urging that defect in the award.

The order under review will, therefore, be set aside and annulled, and the case will be remanded to the court below for the appointment by it of other commissioners and for further proceedings according to law and not in conflict with the views expressed in this opinion.

*Reversed and remanded for further proceedings.*