## Richmond

Virginia Electric and Power Company. v. Alice Young Farrar, Et Al.

April 27, 1964.

Record No. 5675.

Present, All the Justices.

*E. Milton Farley, III* and *Evans B. Brasfield* (*George D. Gibson; Hunton, Williams, Gay, Powell & Gibson*, on brief), for the appellant.

*John Y. Hutcheson,* for the appellees.

Buchanan, J., delivered the opinion of the court.

Virginia Electric and Power Company appeals from an order confirming the reports of condemnation commissioners assessing com-

pensation and damages for land in Mecklenburg county taken in eminent domain proceedings from three adjoining tracts owned respectively by Alice Young Farrar, Eula Young and John Thomas Williams, and from a tract owned by William R. Baskerville, Jr., and others, herein referred to as defendants.

The property sought by the Company was the fee simple title to the bed and the banks of Allens Creek to a stated height as it flowed along the borders of the Farrar, Young and Williams tracts, and of Miles Creek as it flowed along the border of the Baskerville tract, together with a small additional area of that tract.

Both of these streams empty into the Roanoke River and the property sought to be condemned was alleged to be needed by the Company in connection with a dam it proposed to construct on Roanoke River, know as its Gaston Hydroelectric Project, to be located downstream from the Kerr Dam. The Gaston Dam, it was alleged, might raise the waters to a height at the dam not exceeding 204 feet above mean sea level.

The Young tract, which contains about 212 acres, fronts some 5740 feet on the west side of Allens Creek and lies 8.1 miles from the mouth of that creek at the Roanoke River. The area taken from that tract was 3.14 acres, for which the commissioners awarded $628 for the land taken and $4694 for damages to the residue, a total of $5322.

The Farrar tract, adjacent to the Young tract, containing 214 acres, fronts about 6640 feet on the west side of Allens Creek and lies 7.1 miles from the mouth of that creek. The area taken from that tract was 6.3 acres, for which the commissioners awarded $1260 for the land taken and $2020 for damages to the residue, a total of $3280.

The Williams tract contains 403 acres and fronts some 8820 feet on the east side of Allens Creek. It lies 6.8 miles from the mouth of that creek. The area taken from this tract was 3.6 acres, for which the commissioners awarded $720 for the land taken and $5540 for damages to the residue, a total of $6260.

The Baskerville tract contains about 336 acres and is situated on Miles Creek, which flows into Roanoke River at a point a few miles downstream from the mouth of Allens Creek, the exact distance not being shown. The distances of the Baskerville farm from the mouth of Miles Creek and from the site of the proposed Gaston Dam are also not shown by the evidence. The area taken from this tract is 19.4 acres, for which the commissioners awarded $1940 for the land taken and $6460 for damages to the residue, a total of $8400.

The Farrar, Young and Williams cases were heard by the same commissioners in one proceeding on May 4 and 5, 1962. The Baskerville case was heard on May 7 and 8 by a commission which included three of the commissioners who served in the first proceeding.

The Power Company contends that these awards were grossly excessive as a result of the court's allowing the owners' witnesses to testify that the taking of the property so acquired would cause the remaining lands of the owners to be flooded to their great damage. The Company contends that such flooding is an impossibility, that the right to cause it is neither sought nor given in these proceedings, and if caused in the future by the construction and operation of its Gaston project, it would be liable therefor and would have to make compensation for it if it happened.

According to the record the Company acquires title to the bed of Allens Creek on the lands of the defendant owners and to its banks or slopes up to a contour level of 214, *i.e.*, to 214 feet above sea level; and it acquires title to the bed of Miles Creek on the Baskerville property and to its banks or slopes up to a contour level of 210.

James M. Hagood, a Senior Engineer for the Power Company, and conceded by the defendants to be "a fully qualified engineer," testified that about 1957 the Company began preparing to apply to the Federal Power Commission for a license for this Gaston project; that for two years prior to receiving the license he had worked almost continuously on various aspects of the project and that he knew the amount of water released from the Kerr Dam under various conditions; that under normal operating conditions of the Kerr Dam the elevation of the water in the Gaston reservoir at the mouth of Allens Creek will be between 200 and top 204; that for most of the time the elevation will be substantially below 204. This, he said, was because 204 is the elevation point with a maximum power discharge at Kerr Dam of 40,000 cubic feet of water per second; that only once since Kerr Dam was built in 1953 has that much been discharged for a longer period than an hour or so and that was under a test condition, and at that time the recorded elevation at the mouth of Allens Creek was 201.

On the basis of the average discharge from Kerr Dam, said Hagood, the difference in the height of the water under the present conditions and after the dam is built will be not more than two feet, and this

would have no effect at all on these properties located on the headwaters of the creek. He was then asked why the Power Company was acquiring this land, and this is the substance of his reply:

The Company seeks to acquire title in fee to all land that would be flooded by the discharge from Kerr Dam under maximum flood conditions; that back in 1940, some thirteen years before the Kerr Dam was built, rain coupled with a hurricane caused the greatest flood in that area in recorded history; that under such maximum flood conditions the water released by Kerr Dam would raise the water elevation at the mouth of Allens Creek to 213 or 214. Even that, he thought, would not affect the properties here involved because the maximum discharge from Kerr Dam would not coincide with the peak flow down at Allens Creek.

Hagood further testified that the slopes of Allens Creek would be cleared back along contour 206 for about half way to the downstream boundary of the Williams land, which would clear up the logs and debris now blocking the mouth of the creek and substantially increase the carrying capacity of the stream.

He testified that the slope of Miles Creek on the Baskerville property would be cleared up to 204 or a little more, and that the construction of the Gaston Dam would not have any effect on the Baskerville property under normal conditions which, according to his study, would prevail 99.95 percent of the time. He explained that at a time of maximum flood conditions the release of the water by the Kerr Dam and the operation of the Gaston Dam would bring the elevation of the water at Miles Creek to 210, and that was the reason for acquiring title to the Baskerville land to that point; but he pointed out that such was a very rare occurrence and had happened only once before in a recorded period of fifty years, and never before that so far as could be ascertained. He added that it would be physically impossible to keep the water at the 204 clearing line or at the 210 taking line, which could only be reached under the maximum flood condition described.

There is no contradiction in the record of the testimony given by Hagood as to the various elevations involved.

It is abundantly clear that the witnesses for the defendant landowners based their estimates of damage in substantial part on the theory that Gaston Dam would cause the waters of Allens and Miles Creeks to rise to the outside lines of the land to be taken and thereby flood the lands of the defendants adjacent to the creeks.

One of these witnesses, J. R. Orgain, Jr., testified that an average storm in the watershed of Allens Creek "would flood these lands." He knew, he said, that this creek "would be completely flooded with this new reservoir." "The creek bottom is going to flood and drain on these adjacent properties every time that you get a one inch rainfall or more." He thought it would make the adjoining land no longer suitable for farming. Eventually, he said, the creek bed will fill up and silt up and the water will fan out over the whole low ground. His estimates of damages were $8500 on the Farrar tract, $33,100 on the Young tract, $31,000 on the Williams tract, and $20,500 on the Baskerville tract.

Another of these witnesses, Stuart G. Keedwell, spoke of a recent freshet which raised the water in Allens Creek approximately ten feet, and he reasoned that if the water level had been 214 to start with the creek would have gone over its banks and spread out over the low grounds. He said the whole thing was based on sedimentation and with the water "standing there at the 214" the waters coming in would raise flood waters and you would have the water backed up. They are going to have flooding, he said. His estimates of damages were $5700 for the Farrar land, $15,900 for the Young land, $12,750 for the Williams land, and $16,000 for the Baskerville land.

One of the landowners testified that if the water in Allens Creek is put to 214 and held there, flooding would be caused by the extra water. Baskerville testified that if the Company took to the line shown on the map it would ruin everything in the creek bottoms, and that he based his damages on the fact that all of his low land would be flooded at certain periods every day.

The plaintiff objected to the admission of testimony as to damage from supposed additional flooding and requested the court to instruct the commissioners to disregard it, which the court declined to do. The Company also offered a written instruction which would have told the commissioners that it was not seeking to acquire any right to flood or otherwise occupy any property of the defendants outside of the property to be taken in fee simple and that they should not allow compensation for such flooding, but the court refused to give the instruction. The testimony so objected to was inadmissible and should not have been considered by the commissioners, who stated in their reports that they based their awards on their view and on the evidence before them.

The plaintiff sought to acquire title to the creek beds and their slopes to definite and specific heights, for the purpose of flooding the slopes to those elevations if the maximum flood condition that once occurred should happen again. If by the operation of its Gaston Dam, or otherwise, it hereafter floods land that it has not acquired and does not own, it may be compelled to compensate the owners for such damage; but it should not in this proceeding be required to pay for wrongs which it has not done and which it does not expect to do and does not ask to be allowed to do.

"* * Future apprehended damages due to negligent construction or operation of the works of the condemnor cannot, as such, be legally included in the award of the commissioners; for the law furnishes a remedy in the future for the recovery of all such damages, and the right to such recovery is not at all affected by the condemnation proceeding. * *." *Appalachian Power Co.* v. *Johnson,* 137 Va. 12, 26, 119 S.E. 253, 257. 29 C.J.S., Eminent Domain, § 154, p. 1013; 1 Orgel on Valuation under Eminent Domain, 2d ed., § 60, p. 268. Cf. *Arnerich* v. *Almaden Vineyards Corp.,* (D.C.App.), 52 Cal. App. 2d 265, 126 P.2d 121.

The evidence is that the lands in the creek bottoms are now subject to overflow. It was admitted that Miles Creek frequently overflows under present conditions, before the dam is built. Defendants' counsel stated: "It overflows now, everybody agrees to that." There was evidence that similar conditions presently exist on the Allens Creek properties. It is obviously unjust to require the plaintiff to pay damages for flooding that it does not cause or to which it has not contributed.

The court properly instructed the commissioners that they should ascertain just compensation to the landowners for the land taken and the damages, if any, to their remaining property caused by the taking and the construction and operation of the Company's works; and that in ascertaining such damages they should award to the owners the difference in market value before and after the taking. Plaintiff concedes that any obstruction or impairment of drainage caused by the taking and resulting in injury to the defendants' properties would be a proper element of damage; but that element must be distinguished from the element of flooding land not taken for that purpose.

In the Baskerville case the court instructed the commissioners that in determining damage to the remainder of that property they

should not "compute, consider or make an award for any possible future claims for flooding caused by the Power Company beyond the limits of the property to be acquired."

Such an instruction was not given in the Allens Creek case, and in both cases the court overruled the plaintiff's objection to the evidence about future flooding when it was offered, and overruled plaintiff's motion to strike it out and to instruct the commissioners not to consider it. On the contrary, in both cases an instruction was given which told the commissioners to consider all the evidence, and the reports of the commissioners indicate that they did so.

It rather clearly appears that the evidence as to damage by future flooding played an important part in the awards made by the commissioners, and the order confirming the commissioners' reports must therefore be reversed.

While it was repeatedly stated to the court and commissioners and in argument here that the Power Company did not seek and did not acquire any right to flood any of defendants' properties beyond the part taken, and that the owners could continue to use water from the creeks for agricultural or any other purpose, the wording of the Company's petition, which is carried into the commissioners' reports and will be recorded, does not make that clear. The petition should therefore be amended so as to make these matters clear and specific.

The order appealed from is accordingly reversed, the awards of the commissioners are set aside and the cases are remanded with direction that the petition be amended in the respects stated, and that other commissioners be then appointed to ascertain compensation for the land taken and damages, if any, to the residue.

*Reversed and remanded.*