# Richmond

## J. A. ANDERSON, STATE HIGHWAY COMMISSIONER v. CHESAPEAKE FERRY COMPANY.

June 9, 1947.

Record No. 3232.

Present, Holt, C. J., and Hudgins, Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*Abram P. Staples, Attorney General,* and *Walter E. Rogers, Assistant Attorney General,* for the appellant.

*Tazewell Taylor* and *John B. Jenkins, Jr.,* for the appellee.

BUCHANAN, J., delivered the opinion of the court.

This suit presents a question as to the proper measure of compensation for the use of the Chesapeake Ferry Company's properties which were taken over and operated by the State Highway Commissioner under an Act of the General Assembly, approved February 22, 1946 (Acts 1946, ch. 39, p. 59; Code, 1946 Supplement (Michie), sec. 2072(33) ), which is copied in the margin.[1]

[1] Be it enacted by the General Assembly of Virginia:

1. Section 1. Definition.—As used in this act,

(a) The word "ferry" shall be construed as meaning any business or enterprise conducted for private profit in the normal course of which motor vehicles are transported by steamboats or other vessels· across any waters within the state under such circumstances that the operation of same serves or functions as a connecting link between highways which are a part of the State Highway System, and which service enables the continuation or resumption of travel by the operator of any such motor vehicle over said highways on the opposite side of said waters.

(b) The words "facilities and equipment" shall mean all personal property customarily used in operating a ferry, including steamboats and other vessels.

(c) "Docks and wharves" shall mean all docks, wharves, platforms,

At the time of the passage of this Act the ferry company was the owner of two ferries across Hampton Roads, one from Wiloughby Spit, in Norfolk, to Old Point Comfort, and the other from Pine Beach, in Norfolk, to Newport News. It had been operating these ferries for several years, but their operation had been suspended for some two weeks prior to February 22, 1946, due to a strike by its employees. These ferries constituted important links in the State Highway System, and this suspension of operation had naturally resulted in inconvenience and hardship to the public. To prevent this public inconvenience and hardship during the period of such labor disputes, the Act was passed authorizing the State Highway Commissioner, with the approval of the Governor, to exercise the power of eminent domain and acquire for temporary use and operation any ferries, with their facilities and equipment, when the owners or operators were unable or unwilling to operate them.

February 22, 1946, the day the Act was approved, the

landing places, and approaches thereto and exits therefrom, and all buildings auxiliary or proximate thereto, customarily used in, or in connection with, the operation of any ferry.

Section 2. Whenever the owner or operator of any ferry, as defined in section one of this act, is unable for any reason to operate the same in accordance with the normal course of business of said ferry, or for any reason is unwilling to so operate same, the State Highway Commissioner (hereinafter called the "Commissioner"), in addition to the powers of eminent domain vested in him by section one of chapter three hundred and eighty of the Acts of Assembly of nineteen hundred forty, is hereby vested with the power of eminent domain, so far as same may be necessary, to acquire for temporary use in connection with the State Highway System any such ferry, the normal operation of which has been so impaired or suspended, together with all "facilities and equipment", "docks and wharves", or other property necessary or proper in connection with the operation of same. In no case shall the Commissioner exercise the power hereby conferred until such exercise is approved in writing by the Governor.

Section 3. Before entering into the possession of any such ferry or other property, the Commissioner shall notify the owner or operator of same that in his opinion the normal operation of said ferry has been so interrupted, curtailed, impaired, or suspended, as to result in a serious obstruction to the use and operation of the State Highway System, and that said Commissioner requests the delivery to him and his agents of possession of said ferry and other property which may be desired. Unless the

State Highway Commissioner filed his petition alleging that for two weeks or longer the operation of said ferries had been suspended because of the inability or unwillingness of the ferry company to operate them, and that such suspension constituted a serious obstruction to the use and operation of the State Highway System, as well as serious inconvenience to the general public; that the Commissioner had so notified the ferry company and, with the approval of the Governor, and under the authority of the said Act, had requested the delivery to him and his agents of possession of said ferries and the facilities and equipment used in connection with their operation, but the ferry company had failed and refused to comply with said request. The petition asked for a rule against the ferry company to show cause why said properties should not be delivered as requested.

The rule was issued, the ferry company filed its answer admitting the allegations of the petition, and on February 25, 1946, the court entered its order, finding, among other things,

owner or operator believes that the Commissioner is mistaken in his conclusion that the ferry service has been so adversely affected as asserted by him, said owner or operator shall forthwith deliver possession in accordance with said request. In the event of the refusal of such possession, upon application of the Commissioner any court of record of any county or city in which any terminal point of any such ferry is located, or the judge thereof, in vacation, shall issue a rule requiring such owner or operator to show cause why the said possession should not be delivered as requested. The rule shall be given preference over all other matters pending before said court. The said court or judge, after reasonable notice, shall hear the parties and determine as promptly as possible the question of fact relating to the service, if any, being rendered by the ferry and whether the facts require the delivery of said possession under the provisions of this act, and render judgment requiring or denying delivery of possession as the case may be.

Section 4. Upon delivery to him of possession of any such ferry and properties, it shall be the duty of the Commissioner, by and through his agents and employees, to operate the same for the account of the State Highway Department in such manner as will best meet and satisfy the public needs and facilitate the operation and use of the State Highway System. He shall collect the same charges, tolls or rates as were last customarily imposed by the ferry before delivery of such possession, and pay the same into the State treasury for credit to the highway funds.

Section 5. Whenever the owner or operator of any such ferry shall notify the Commissioner in writing, stating that he is in position to, and

that the operation of the two ferry lines had been suspended for two weeks or longer by the inability or unwillingness of the ferry company to operate them, resulting in serious obstruction to the use and operation of the State Highway System, and decreeing that the ferry company deliver possession of said ferries, with all facilities and equipment, docks, wharves and the property necessary or proper in connection with the operation of same. The Commissioner was ordered, in conjunction with the ferry company, to make a complete inventory of all such property with a brief description of its then condition, and give the ferry company receipt therefor on receiving possession.

The order further directed that the Commissioner and the ferry company, within thirty days, agree on "a reasonable, proper and lawful compensation" (the language of the Act) for the use of said ferries and other property, and if they failed

can and will resume operation and render normal ferry service, and shall satisfy the Commissioner of the correctness of such statement, the Commissioner shall restore the possession of the ferry and all property so acquired by him to the said owner or operator upon his request. In the event the Commissioner refuses such restoration of possession, the owner or operator shall have the right to have a rule issued in the manner provided in section three hereof requiring the Commissioner to show cause why such possession should not be restored, and the court shall determine the matter as in said section provided.

Section 6. The owner or operator of said ferry shall be entitled to receive reasonable, proper, and lawful compensation for the use of the ferry and other properties by the State and shall be paid same out of the State highway funds in the State treasury. In the event the Commissioner and the owner or operator are unable to agree upon the amount of such compensation either party in interest may file a petition in any court mentioned in section three hereof for the purpose of having same judicially determined. The court shall, without a jury, hear such evidence and arguments of counsel as may be deemed appropriate and render judgment thereon, or may refer to a commissioner such questions as are considered proper and act upon the commissioner's reports as in ordinary chancery proceedings. An appeal shall lie to the Supreme Court of Appeals from any final judgment of the court rendered under this section or under section five hereof.

Nothing in this act shall be construed to affect any ferry owned or operated by any municipality or county or jointly owned or operated by any municipality or county of this State.

2. An emergency exists and this act is in force from its passage.

to agree, either party might file a petition to have the question judicially determined.

October 14, 1946, nearly eight months later, the ferry company filed its petition stating that it and the Commissioner had made several *bona fide* efforts to agree on compensation, but had been unable to do so, and asked the court to determine the question in accordance with the contention of the ferry company, that the compensation contemplated and provided for by the Act was the net profits of the operation, ascertained by deducting from gross revenues the cost of operation and maintenance and reasonable overhead charges. The petition prayed that the court proceed, without a jury, to hear evidence and argument and render judgment as to the basis of past and future compensation, and to fix the amount, if necessary, or refer to a commissioner such questions as considered proper, as in chancery proceedings, as provided by the Act.

October 17, 1946, the Commissioner filed his answer admitting the allegations of the petition as to what had occurred, but taking issue on the method of compensation contended for by the ferry company, and averring that when he took possession of the ferries the ferry company had not operated them for a period of approximately three weeks, due to labor disputes with its employees, and that during that time the properties were idle and productive of no revenue to the ferry company, but a burden to it because of administrative and maintenance expenses; that under the provisions of the Act the ferry company was entitled to the return of the possession of its properties at any time it was able and willing to resume their operation, but that due to said labor disputes the ferry company had at all times been, and still was, unable to assume its lawful duty and obligation of rendering such ferry service, and that if the Commissioner had not, in the exercise of the power of eminent domain, operated said properties, the ferry company would not have received any return therefrom, but would have suffered material loss on account of the maintenance cost and the expense of protecting the properties.

The answer further stated that in operating the ferries the State had assumed, and was still being subjected to, risks of loss from liabilities arising under the State Workmen's Compensation Law and from physical damage to the ferry properties as the result of hazards incident to their operation; that the revenues from the operation of the ferries by the Commissioner had produced funds over and above operating and maintenance costs which would be far in excess of a reasonable, proper and lawful compensation for the use of the ferries and other properties; and that such reasonable, proper and lawful compensation for the use of the ferries and other properties could be determined only by allowing a fair rental charge, not to exceed six per centum interest upon the value of the properties, plus a proper allowance for wear and tear resulting from the use of said properties.

No evidence was introduced but the matter was heard October 26, 1946, on the petition of the ferry company, the answer of the Commissioner and argument of counsel, and the court then entered a decree adopting the contention of the ferry company and adjudicating that the compensation contemplated and provided for by said Act "is to be determined, both as to past and future compensation, by an accounting between the parties hereto in which the gross revenues resulting from the operation of said ferries by the State Highway Commissioner shall be stated and from which there shall be deducted the reasonable and proper costs of operation and maintenance, including therein any reasonable out-of-pocket expenditures made on account of said operation and maintenance by said Commissioner, together with any reasonable overhead charges incurred or paid by him and allocable to said operation, and that after deducting said amounts from said revenue, the balance remaining shall constitute a reasonable, proper and lawful compensation for the use of the petitioner's ferries and other properties by the State Highway Commissioner, pursuant to said Act and the provisions of the Constitution of the State of Virginia and of the United States in this and similar cases."

In other words, the court held that the profits made by the

taker on the property, taken under eminent domain, were the measure of just compensation for the taking. In our view, that holding is contrary to the principles long established and used in ascertaining the just compensation required by the Fifth Amendment to the Federal Constitution and section 58 of the Constitution of Virginia to be paid when private property is taken for public use; and works a result that was not intended by the Act, and that is inequitable under the circumstances shown by the record.

No constitutional question is involved and we are concerned only with the construction or application of the Act, the validity of which is in no wise assailed or drawn in question.

It is to be remembered that the ferry company was not a going concern at the time of the taking. The ferries were then producing nothing for their owner, had not done so for more than two weeks, and would not and could not earn anything for the ferry company so long as the strike continued.

The profits that have been made by the Highway Commissioner do not represent money that has been taken away from the ferry company. It is money that has been made by the Highway Commissioner by using the power of the State to quicken into action an idle enterprise. It would have remained idle and without any capacity to earn for its owner except for the exercise of the State's authority. That authority should not be used to make money for the owner that the owner could not have made for itself.

The Highway Commissioner took over the property to operate it in the public interest because the owner was unable or unwilling to do so. The owner could have it back just as soon as it was able and willing to operate it. That is what the Act provides. Its use by the Highway Commissioner was only for the period during which the owner could not or would not operate it and, therefore, was only for a period when the property could not produce any earnings for the owner.

The Act provides that the amount to be paid to the

owner for that use shall be "reasonable, proper and lawful compensation." That is, and could be, nothing more or less than the just compensation guaranteed by the Federal and State Constitutions to be an inseparable incident of the exercise of the power of eminent domain.

The general rule, adhered to by this court, is that just compensation is pay to the owner for what he loses (29 C. J. S., Eminent Domain, secs. 136, 160, pp. 968, 1028; *Burger* v. *State Female Normal School*, 114 Va. 491, 77 S. E. 489; *Chairman of Highway Comm.* v. *Fletcher*, 153 Va. 43, 149 S. E. 456); the full and perfect equivalent for what is taken (*Pruner* v. *State Highway Com'r*, 173 Va. 307, 4 S. E. (2d) 393).

Said Mr. Justice Holmes in *Boston Chamber of Commerce* v. *Boston*, 217 U. S. 189, 30 S. Ct. 459, 54 L. Ed. 725, the Constitution "merely requires that an owner of property taken should be paid for what is taken from him. It deals with persons, not with tracts of land. And the question is, What has the owner lost? not, What has the taker gained?"

This principle was repeated and elaborated by Mr. Justice Lurton in the leading case of *United States* v. *Chandler-Dunbar Water Power Co.*, 229 U. S. 53, 33 S. Ct. 667, 57 L. Ed. 1063, in this language:

" 'The requirement of the 5th Amendment is satisfied when the owner is paid for what is taken from him.' * * * * The value should be fixed as of the date of the proceedings, and with reference to the loss the owner sustains, considering the property in its condition and situation at the time it is taken, and not as enhanced by the purpose for which it was taken." (33 S. Ct. 677).

"That the property may have to the public a greater value than its fair market value affords no just criterion for estimating what the owner should receive. * * * * But in a condemnation proceeding, the value of the property to the government for its particular use is not a criterion. The owner must be compensated for what is taken from him; but that is done when he is paid its fair market value for all available uses and purposes." (33 S. Ct. 678-9).

"The government's obligation is to put the owners in as good position pecuniarily as if the use of their property had not been taken." *Phelps* v. *United States*, 274 U. S. 341, 47 S. Ct. 611, 612, 71 L. Ed. 1083.

"The compensation to which the owner is entitled is the full and perfect equivalent of the property taken. *Monongahela Nav. Co.* v. *United States*, 148 U. S. 312, 327, 13 S. Ct. 622, 37 L. Ed. 463. It rests on equitable principles and it means substantially that the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken." *Seaboard Air Line R. Co.* v. *United States*, 261 U. S. 299, 43 S. Ct. 354, 356, 67 L. Ed. 664.

In *Olson* v. *United States*, 292 U. S. 246, 54 S. Ct. 704, 78 L. Ed. 1236, Mr. Justice Butler stated the same principle in these words:

"He (the owner) is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." (54 S. Ct. 708). "* * * But the value to be ascertained does not include, and the owner is not entitled to compensation for, any element resulting subsequently to or because of the taking." (54 S. Ct. 709).

What was taken by the Highway Commissioner here was not the property but the temporary use of it. All the ferry company is entitled to is pay for what was taken at the time it was taken, not for what the taker made out of it after it was taken. What the Highway Commissioner made from the use of the property is not what the owner would have made if the property had not been taken.

The result of the court's holding is to pay the ferry company, not a just compensation for what was taken from it, but a compensation which was, in very important part, created by the use of the State's sovereign power, not available to the ferry company, and without which no profit at all would have been made. To pay the company on that basis includes in its compensation the value of the State's power to operate, and that is an element of value it is not entitled to have.

The situation here is unusual. The properties of the ferry company have been taken over and operated by the State under its power of eminent domain because of the inability or unwillingness of the ferry company to operate. The taking has been for a period during which that inability or unwillingness continued. The situation is new, but the principles for the solution of the question involved are old.

The quest is to find what is just compensation to the ferry company for what has been taken from it. If the taking were permanent, just compensation would be the fair market value of all that was taken. The fact that the taking is temporary does not require just compensation for the taking to be based on new principles. As just compensation for a permanent taking is fair market value, so just compensation for temporary taking can only be a fair rental value.

The measure of fair rental value could not be the profits made by the taker. In many cases and under different conditions there might well be no profits. The application of such a principle would then necessarily result in a taking without any compensation. If there had been no profits in this case, the State could not maintain the position that it should then pay the owner nothing for the taking. It would have to pay the owner just compensation even if there had been a loss. In that case, the measure of that compensation could only be fair rental value.

In no case to which we have been referred or that we have found have the profits of the taker been held to be the measure of just compensation either for a permanent or for a temporary taking. At most they have been considered only as an element in determining fair market value or fair rental value, which is the universal measure of just compensation.

*Egan* v. *Philadelphia*, 108 Pa. Super. 271, 164 A. 813, holds: "The principles involved and governing are the same whether there be a permanent taking or one for temporary use only. In the former the fair market value is to be ascertained, in the latter, the fair rental value." (p. 814).

In that case the city condemned land of the appellant for temporary use in connection with its sesqui-centennial

exposition. The evidence was that the normal rental value was $75 a month, but the appellant offered evidence that the value was $1500 a month, based on the fact that the sesqui-centennial was directly across the street. The court held that this testimony was properly rejected, quoting Mr. Justice Holmes in *New York* v. *Sage*, 239 U. S. 57, 61, 36 S. Ct. 25, 60 L. Ed. 143, that " 'The city * * * is not to be made to pay for any part of what it has added to the land by thus uniting it with other lots, if that union would not have been practicable or have been attempted except by the intervention of eminent domain.' " (p. 815).

See also, *Louisville, etc., R. Co.* v. *R. E. E. DeMontluzin Co., Inc.,* 166 La. 211, 116 So. 854; *In re Condemnation of Lands for Military Camp,* 250 F. 314.

In *Pierce* v. *Platte Valley Public Power, etc., Dist.,* 143 Neb. 898, 11 N. W. (2d) 813, the land taken for temporary use was occupied by a tenant under a contract reserving rent of one-half of the crops. The court there held that just compensation for the temporary use was the value of the crops that "could and would" have been grown on the land. That, of course, was what was taken from the owner. The profits made by the Commissioner in operating these ferries are not what "could and would" have been made by the ferry company during the period of the use, because the company could not and would not have made anything during that period.

In *Prince Line, Ltd.* v. *United States,* 283 F. 535, fair rental value was recognized as the proper measure of compensation for the temporary possession and use by the government of certain piers. The question at issue was whether fair rental value was to be determined under normal market conditions as claimed by the government, or under abnormal conditions resulting from the war. The government did not need one of the piers and rented it out at the high prevailing rental. It then offered to pay to the owner on the basis of what would have been a fair rental under normal market conditions. The court held that it should pay on the basis of what it had received, because that represented fair rental

value available to the owner under the conditions actually prevailing, adding that "the constitutional authority of the government to take property and to render just compensation therefor means that the government should pay a fair valuation for that of which the party owning the property is deprived." (p. 539).

See also, *Cape Girardeau* v. *Hunze,* 314 Mo. 438, 284 S. W. 471, 47 A. L. R. 25.

■ While the profits made by the Highway Commissioner are not the measure of just compensation to be paid the ferry company, evidence thereof will be admissible as bearing on the question of fair rental value. The answer sought is the fair market value of the right to use the properties of the ferry company, including its right to take tolls. The purchaser of that right would naturally consider what he could afford to pay under all the circumstances. Those circumstances would include the risks of operation, of further regulation of the tolls he could charge, as well as the necessity of meeting or compromising the demands of labor. He could not operate with the advantages possessed by the Commissioner. The tolls the Commissioner must charge are fixed by the statute under which he operates, and he has the advantage of another statute (Acts 1946, ch. 333) imposing a penalty on labor for striking while he is in charge.

In *Olson* v. *United States, supra,* this was said on the subject of just compensation (54 S. Ct. 708-9):

"Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. * * * * "

"Flowage easements upon these lands were not currently bought or sold to such an extent as to establish prevailing prices, at or as of the time of the appropriation. As that measure * * * is lacking, the market value must be estimated. In respect of each item of property that value may be deemed to be the sum which, considering all the circumstances, could have been obtained for it; that is, the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy. In making that estimate there should be taken into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining."

This case also discusses *Mississippi, etc., Boom Co.* v. *Patterson,* 98 U. S. 403, 25 L. Ed. 206, and points out that the reason for holding in that case that the use of the property for log boom purposes should be considered on the question of compensation was because its availability for that use affected its market value.

In *Richmond, etc., R. Co.* v. *Chamblin,* 100 Va. 401, 41 S. E. 750, this is said (p. 406):

"It seems to be well established that damages to the trade or business of the land-owner are generally too remote to be a subject of damages, because they depend upon contingencies too uncertain and speculative to be allowed. 6 Am. & Eng. Ency. Law (1 Ed.), 573."

This case is cited in a note to *Gauley, etc., R. Co.* v. *Conley,* 84 W. Va. 489, 100 S. E. 290, 7 A. L. R. 157, where the annotator says (7 A. L. R. 164):

"With remarkable unanimity the American jurisdictions hold that evidence of profits derived from a business conducted on property is too speculative, uncertain, and remote to be considered as a basis for computing or ascertaining the market value of the property in condemnation proceedings."

But in the same note it is stated (p. 171):

"Where it appears that the property condemned is of such a nature that the profits derived from its use are the entire

or chief source of its value, evidence of the amount of the profits is to be considered in determining the market value." Many cases supporting the statement are cited.

In *Lebanon, etc., Turnpike Co.* v. *Creveling*, 159 Tenn. (6 Smith) 147, 17 S. W. (2d) 22, 65 A. L. R. 440, the court said:

"While we hold that net income, present or prospective, is not controlling, evidence thereof is altogether competent; the weight to be given such evidence as may be adduced being for the jury, in connection with all other material evidence." (65 A. L. R. 448).

In an annotation to that case (65 A. L. R. 456) it is said: "As a general rule the courts accede to the view that income from property in the way of rents and profits is an element of consideration in arriving at the market value or measure of compensation to be paid for taking property in condemnation proceedings."

*Monongahela Nav. Co.* v. *United States*, 148 U. S. 312, 13 S. Ct. 622, 37 L. Ed. 463 (cited in support of the rule, along with other federal and many state cases), is a leading case and is much relied on by appellee in its brief. But that case is not authority for the holding of the trial court that the profits made by the Commissioner are the measure of just compensation to the ferry company. Unlike these ferries, the property there taken was a going concern, and its owner was receiving tolls under a franchise. The court did not hold that the owner must be paid the tolls that the government would receive after the taking, but held that the right of the owner to charge tolls, an active right which the government took from the owner, must be considered in arriving at just compensation for the property taken. This sentence from the opinion (37 L. Ed. 472) is the essence of the holding in that case on the point involved here:

"If a man's house must be taken, that must be paid for; and, if the property is held and improved under a franchise from the state, with power to take tolls, that franchise must be paid for, because it is a substantial element in the value of the property taken."

*United States* v. *General Motors Corp.*, 323 U. S. 373, 65 S. Ct. 357, 89 L. Ed. 311, 156 A. L. R. 390, involved a question of just compensation for the temporary use of a warehouse taken by the government, under the Second War Powers Act, from a tenant holding under a long-term lease. It was held that "The value of such an occupancy is to be ascertained, not by treating what is taken as an empty warehouse to be leased for a long term, but what would be the market rental value of such a building on a lease by the long-term tenant to the temporary occupier. The case should be retried on this principle. In so ruling we do not suggest that the long-term rental value may not be shown as bearing on the market rental value of the temporary occupancy taken.. It may be evidence of the value of what is taken but it is not the criterion of value in such a case as this." (65 S. Ct. 361).

While the fair rental value of the ferry properties is the measure of just compensation for their use, the limitation of not to exceed six per centum upon the value of the properties, plus a proper allowance for wear and tear, proposed by the Commissioner, is an arbitrary limitation which should not be imposed in the absence of any facts from which it may be determined whether the result would represent fair rental value.

We are told in the Commissioner's reply brief that it appears likely that the profits from the Commissioner's operations for a year will be nearly $400,000 on properties which the ferry company has reported for taxation at a value of $240,000. As we have pointed out, there are elements in these profits which do not belong to the ferry company, and for which it is not entitled to compensation.

The fair rental value to which the ferry company is entitled is to be determined with reference to the value of its properties at the time of the taking, and their earning capacity under all the facts and circumstances existing at the time of the taking.

The appellee says this will be a task of great difficulty. With the information in hand, including the inventory re-

quired to be made when the Commissioner took charge, and the known results of his operations, the difficulty should not be extraordinary. But even so, that is not sufficient reason against applying the proper method to ascertain the reasonable, proper and lawful compensation required by the Act to be paid for the State's use of the ferries. Moreover, the information obtained should be useful in the condemnation proceeding which we are told the State is preparing to institute to acquire the ferry properties.

If the application of that method results in profits to the State that the legislature did not expect to accrue, that is not the fault of the State. These profits result from tolls paid by the public for the use of the properties owned by the ferry company and operated by labor which the Act makes the agents and employees of the Commissioner, operating the ferries for the account of the State Highway Department. It is not inequitable for the Commissioner to retain for the benefit of the public such profits as remain after paying the ferry company just compensation for the use of its properties.

Rather would it be unjust under the circumstances to pay all profits to the ferry company, regardless of whether they exceed just compensation. To do so would make the Commissioner, contrary to the plain language and intendment of the Act, the agent of the ferry company, operating the ferries for the benefit of the ferry company and placing it in the happy position of having all to gain and nothing to lose by the Commissioner's continuing to operate the ferries. So long as the properties remain in the hands of the Commissioner the tolls must remain the same. They are not subject to reduction by the regulatory authority, as they are when the ferry company is in possession, even though they produce a profit far in excess of a fair return on the investment.

Since the Commissioner has assumed control, the ferries are not to be returned to the ferry company until it is able and willing to operate them. If the ferry company could take all the profits, without having either to raise wages to

end the strike, or to run the risk of a toll reduction, or to assume any other risks of operation, its willingness to take back its properties might not arrive on winged feet. There would be little incentive for it to try to settle its difficulties with its employees. The result would be to require the employees to work for the profit of the company while they are nominally the employees of the State. The operation by the Commissioner, which has already extended well over a year, could in that case run quite far beyond the temporary use contemplated by the Act.

We reverse the decree appealed from and remand the cause to the trial court with direction to ascertain, in the manner provided by the Act, and according to the principles herein stated, the fair rental value of the ferry properties, to be paid as just compensation to the ferry company for their use.

*Reversed and remanded.*

SPRATLEY, J., dissenting.

Apprehensive of the results and misunderstanding which attend the conclusion of the majority, I feel bound to state my reasons for believing that a correct application of sound principles leads to a different result.

The question for our determination is not the measure of compensation which the State should receive for the use of its sovereign power in taking over the properties of the Ferry Company in the interest of the public, but what is the measure of compensation to be paid the Ferry Company for the temporary use of its properties by the State.

No evidence was taken in the case. Apparently, the parties thought that the allegations in the pleadings were sufficient to present the question of law. However, in the arguments and the briefs of counsel, the historical background of the Chesapeake Ferry system, and the enactment of chapter 39 of the Acts of Assembly, 1946, are given us. We are told that the Chesapeake Ferry Company obtained its charter

in 1912, as a transportation company, under statutory provisions governing public service companies other than railroads; that under its franchise it has since operated a vehicular and passenger ferry service between the northern and southern shores of Hampton Roads, except for several periods during temporary strikes, serving populous communities on both sides of Hampton Roads and connecting highway systems carrying a large amount of traffic; and that since the State took possession of the ferry properties the personnel of the company's organization are actually operating the properties as theretofore.

We are further told that the State, having failed to acquire the ferries by purchase, has authorized condemnation proceedings under statutes providing for their acquisition by the State Highway Commission. The Ferry Company urges that the authorization of the condemnation proceedings is one of the principal reasons why it has not reached an agreement with its employees and requested the return of the properties to it, since it would be of little avail for it to regain a mere temporary possession until the State acquires full ownership.

In the beginning, it is conceded by both parties that the Highway Commissioner did not operate the properties placed in his possession as an agent or custodian of the owner; that the Act approved February 22, 1946, was an emergency Act; that it was anticipated, both at the time of the passage of the Act and the seizure of the property, that the seizure was only for temporary possession; that it was not the purpose of the Legislature to place the ferry properties in the hands of an agency of the State to make money for the State, or to reap a financial advantage from a controversy between management and labor; and that the purpose of the seizure and possession, in this case, was to "best meet and satisfy the needs of the traveling public by continuing operation," in accordance with the Act.

The words "ferry," "facilities and equipment," and "docks and wharves," as defined and read in connection with the language of section 2 of the Act seem to make it clear that a "business or enterprise" conducted as a ferry, necessarily in-

cludes all of the property of its owner, real, personal, or mixed, tangible and intangible, and all rights and franchises customarily used in connection with and incidental to the operation of the ferry system.

In the possession and use of the ferries, the relationship of lessor and lessee did not obtain between the Ferry Company and the State. The relationship is somewhat similar to that which existed between the United States and the rail carriers which the government took over temporarily during the first World War, pursuant to federal statutes.

In *North Carolina R. Co.* v. *Lee*, 260 U. S. 16, 43 S. Ct. 2, 67 L. Ed. 104, where a railroad was temporarily taken over, the court said: "The Government operated this railroad not as lessee, but under a right in the nature of eminent domain."

The relationship was further defined in *Benedict* v. *United States*, 271 F. 714, 719: "A requisition, like a taking by eminent domain, is not a taking under agreement. Acquiescence on the part of a loyal citizen to the taking of his property by the sovereign is not the equivalent of the making of a contract, or the entering into of an agreement, in the legal sense of that term, for the obtaining of the property in question. A requisition is a one-sided exercise of authority, which depends either upon force or the acquiescence and loyalty of the owner of the property requisitioned, in order to accomplish the taking. Whether protest be entered or not, the obligation to repay is the same."

Eminent domain is an attribute of sovereignty, and has long been a part of fundamental law. All kinds of private property and every variety and degree of interest in such property may be taken thereunder, when demanded by public necessity. The extent to which the property may be taken rests within the discretion of the legislative branch. The taking may be absolute or it may be for temporary use; but whatever may be the extent of the taking, either as to quantity, quality, title, or period of time taken, it is subject to the restriction that just compensation must be made. This restriction is embodied in the Fifth Amendment to the Federal Constitution and implied in the Fourteenth Amend-

ment. It is embodied in section 58 of the Constitution of Virginia and implied in section 11. The ruling requisite is that private property shall not be taken for public use without just compensation, and no person shall be deprived of his property without due process of law. It is the *Magna Carta* of property rights.

It is fully established that the measure of compensation when property is taken by eminent domain is a judicial and not a legislative question. The legislature cannot say what compensation shall be paid, or fix the rate of compensation. It must be ascertained by judicial inquiry. *Monongahela Nav. Co.* v. *United States*, 148 U. S. 312, 13 S. Ct. 622, 37 L. Ed. 463.

The cases are legion which deal with the measure of compensation for property permanently taken. There are only a few cases involving compensation for a temporary taking, a proceeding which has come into use within comparatively recent years. In seeking the proper method for measuring compensation in the present case, we must look to the principle upon which compensation should be estimated in any case where the owner is deprived of his property or its beneficial use. That principle has long been established by the courts.

In *Mississippi, etc., Boom Co.* v. *Patterson*, 98 U. S. 403, 25 L. Ed. 206, certain islands, adaptable to boom purposes, were condemned. The condemnor contended that their adaptability to such purpose was of no value to the owner, nor to any one to whom he could make sale, and, therefore, did not affect the market value of the land. Rejecting this contention, Mr. Justice Field said:

"In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties. The inquiry in such cases must be what is the property worth in the market, viewed not merely with reference to the uses to which it is plainly adapted; that is to say, what is it worth from its availability for valuable uses? Property is not to be deemed worthless because the owner allows it to go to waste, or to be

regarded as valueless because he is unable to put it to any use. Others may be able to use it, and make it subserve the necessities or conveniences of life. Its capability of being made thus available gives it a market value which can be readily estimated."

The principle thus enunciated has been many times cited and approved by the Supreme Court of the United States and this court. *Boston Chamber of Commerce* v. *Boston*, 217 U. S. 189, 30 S. Ct. 459, 54 L. Ed. 725; *United States* v. *Chandler-Dunbar Water Power Co.*, 229 U. S. 53, 33 S. Ct. 667, 57 L. Ed. 1063; *Olson* v. *United States*, 292 U. S. 246, 54 S. Ct. 704, 78 L. Ed. 1236; *Richmond, etc., R. Co.* v. *Chamblin*, 100 Va. 401, 41 S. E. 750; *Appalachian Power Co.* v. *Johnson*, 137 Va. 12, 119 S. E. 253; *Charles* v. *Big Sandy, etc., R. Co.*, 142 Va. 512, 129 S. E. 384.

The leading case on the subject of just compensation is *Monongahela Nav. Co.* v. *United States, supra.* In that case the navigation company, under legal authority, had constructed dams, locks, etc., in order to provide slack water navigation along a river. It had a franchise to collect tolls from vessels using its locks. By an Act of Congress, the Secretary of War was authorized to purchase and take over certain parts of the company's properties. The Act provided that in determining the amount to be paid, the franchise providing for the collection of tolls should not be taken into consideration. The property was seized by the government, and an award was made, which the company refused because the franchise was not taken into consideration in the award. Action was. then instituted to recover compensation which included payment for the right to collect tolls. The court held that the navigation company was entitled to recover compensation for the taking of the whole property, including its franchise right to collect tolls, and that Congress could not limit compensation to the value of the bare property without considering its earning power and the demand for its use.

The principles applied in the learned and exhaustive

opinion of Mr. Justice Brewer in that case are so pertinent to the issue before us that I refer the interested student to the whole opinion, contenting myself with a short quotation therefrom. On page 328 of 148 U. S. this is said:

"How shall just compensation for this lock and dam be determined? What does the full equivalent therefor demand? The value of property, generally speaking, is determined by its productiveness—the profits which its use brings to the owner. * * * For that property which is near the center of a large city may command high rent, while property of the same character, remote therefrom, is wanted by but few and commands but a small rental. Demand for the use is another factor. * * * The value, therefore, is not determined by the mere cost of construction, but more by what the completed structure brings in the way of earnings to its owner. For each separate use of one's property by others, the owner is entitled to a reasonable compensation; *and the number and amount of such uses determine the productiveness and the earnings of the property, and therefore, largely its value.*" (Italics supplied.)

In *Seaboard Air Line R. Co.* v. *United States*, 261 U. S. 299, 43 S. Ct. 354, 67 L. Ed. 664, this is said:

"The compensation to which the owner is entitled is the full and perfect equivalent of the property taken. *Monongahela Nav. Co.* v. *United States*, 148 U. S. 312, 13 S. Ct. 622, 37 L. Ed. 463. It rests on equitable principles and it means substantially that the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken."

To the same effect, see *Phelps* v. *United States*, 274 U. S. 341, 47 S. Ct. 611, 71 L. Ed. 1083, where property was taken for temporary use.

*Olson* v. *United States, supra,* was a condemnation proceeding by the federal government to acquire a flowage easement in and upon land bordering a lake. Mr. Justice Butler there said: "Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the

owner does not depend upon the uses to which he has devoted his land, but is to be arrived at upon just consideration of all uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held." (Citing cases.)

In *Burger* v. *State Female Normal School*, 114 Va. 491, 77 S. E. 489, this court said: "The extent, the variety and importance of the uses to which the property may be put, and the number of persons who desire it in order to meet their convenience, or other necessities, is what gives the property its value."

In *Pruner* v. *State Highway Com'r*, 173 Va. 307, 310, 4 S. E. (2d) 393, where land was condemned for State highway purposes, this court accurately and concisely stated the rule adopted in Virginia. We said:

"It is the duty of commissioners who are charged with determining the value of land which is being taken by eminent domain to consider all uses to which it may be reasonably adapted and to award compensation upon the basis of its most advantageous and valuable use, having regard to the existing business demands of the community or such as may be reasonably expected in the immediate future. The uses to be considered must be so reasonably probable as to have an effect on the present market value of the land. Purely imaginative or speculative value should not be considered. Compensation must be a full and perfect equivalent for the property. This means that in the appraisal of the land in question its adaptability for subdivision uses should have been considered as an element in estimating the market value,—its use should not have been confined to that of agriculture alone. *Charles* v. *Big Sandy, etc., R. Co.*, 142 Va. 512, 129 S. E. 384; *Richmond, etc., R. Co.* v. *Chamblin*, 100 Va. 401, 41 S. E. 750; *Appalachian Power Co.* v. *Johnson*, 137 Va. 12, 119 S. E. 253; and in 18 Am. Jur., Eminent

Domain, section 244, page 881, it is written that 'when a tract taken by eminent domain is used as a farm, the owner is entitled to have its possible value for building purposes considered * * * .' "

In *Appalachian Power Co.* v. *Johnson, supra,* we held that compensation to the owner is not limited to the use which the owner is actually making of the land at the time it is condemned, but to its value for any purpose for which it is then reasonably available. We approved that rule as including in the measure of compensation "the adaptation and value of the property for any legitimate purpose or business, even though it has never been so used, and the owner has no present intention to devote it to such use." See also, *Charles* v. *Big Sandy, etc., R. Co., supra,* and *Richmond, etc., R. Co.* v. *Chamblin, supra,* both citing with approval *Mississippi, etc., Boom Co.* v. *Patterson, supra.*

The fair market value of property, at the time when appropriated, means market value under normal conditions—not conditions brought about by strikes, economic depressions, or inflation. In *Kornegay* v. *Richmond,* 185 Va. 1013, 1026, 41 S. E. (2d) 45, in discussing the rule for ascertaining fair market value, we said:

"The subject has been before the courts in a number of recent cases. In *In re Board of Water Supply,* 277 N. Y. 452, 14 N. E. (2d) 789, 792, after pointing out that under the Constitution of New York a person whose property is taken for public use is entitled to 'just compensation' as measured by 'the fair market value of the property taken as of the date of taking,' plus damages resulting to the residue, the highest court of New York said: ' "Fair market value" means neither panic value, auction value, speculative value, nor a value fixed by depressed or inflated prices. * * * "Fair market value" of property actually taken as of the date of appropriation resides in an estimate and a determination of what is the fair, economic, just and equitable value under normal conditions.' Such a principle, the court said, does not 'abrogate or destroy the general rule that value must be

fixed as of the time when the property was converted or taken.'

"In *Public Market Co.* v. *Portland* (Ore.), 170 P. (2d) 586, 597, it is said: '* * * market value means value under ordinary conditions—not conditions either of depression or inflation.' "

In 29 C. J. S., Eminent Domain, section 160, citing the *Pruner Case, supra,* and many other cases, this is said: "The value of the land condemned is not to be estimated simply with reference to the condition in which the owner has maintained it, or for the use to which it is at the time applied, but with reference to any use to which it is reasonably adapted. The best or most valuable use to which the property, which is taken for the public use, is adapted should be considered."

In 18 Am. Jur., Eminent Domain, section 244, we find: "The tribunal whose duty it is to determine the value of land taken by eminent domain is not limited to the value of the land for the purposes for which it is actually used, but may consider all uses to which it is adapted and might be put, and will award compensation upon the basis of its most advantageous and valuable use, having in regard the existing business or wants of the community, or such as may be reasonably expected in the immediate future."

In the same authority, section 240, it is said: "Property sought to be taken under the power of eminent domain is not to be considered worthless because the owner allows it to go to waste or is unable to put it to any use, if it is capable of being put to use by others."

Thus, under established principles governing compensation for land permanently taken, it is clear that the valuation of such property does not depend upon the uses in which it is at the time employed, or the uses to which the owner intends to devote it; not upon what the condemnor does with the property or intends to use it for; and not upon the profit which the condemnor may make from the use of the property. The proper inquiry as to the value of the property

taken is: What is its value for the most advantageous uses to which it may be applied, having regard to the existing business or wants of the community, or such as may be reasonably expected in the near future? For that value a full and perfect equivalent must be paid.

Each of the hereinbefore cited cases relates to property permanently taken. In each there were certain peculiar facts. Consequently, there may be found in the decisions expressions of the judges which must be considered in relation to the facts of the particular case.

In *Boston Chamber of Commerce* v. *Boston, supra,* and in *United States* v. *Chandler-Dunbar Water Power Co., supra,* it was said that the owner must be compensated for what he has lost, that is, what is taken from him, and shall be put in as good position pecuniarily as he would have been if his property had not been taken. Such statements are readily applicable to the facts in those cases. There property was permanently taken, and the owner technically lost his property in the sense that he was deprived of it. Just compensation, based on the value of that property, necessarily puts the owner in as good position pecuniarily as he would have been if his property had not been taken or "lost."

In the present case the Ferry Company has merely lost the possession of its property for a temporary period. By the strike of its employees it lost its ability to operate the properties, but not its right to operate them. It lost the possession of its properties when they were taken over by the Highway Commissioner. It lost its right to operate them at the same time by the same act. For the possession of its properties by the State, in the employment of that right, it asks just compensation.

So long as the ferries remained idle by reason of the labor dispute, they were productive of no revenue to their owner and the owner would have been burdened with costs of preservation and maintenance. The same situation would have been presented if the owner had been unwilling, for any reason, to operate them in the normal course of business. The statute covers both inability and unwillingness to

operate. But if we should here apply a rule that the obligation of the State was only to put the owner in as good position pecuniarily as if the use of the property had not been taken, the owner would get nothing.

The general rules governing compensation for temporary use are the same as those which govern a permanent taking. This is as it should be. If the valuation of property taken permanently is based on its adaptability and availability at its most advantageous use, certainly the value of the use of property taken for a temporary period should be on like basis. It is in accordance with logical reasoning, and with the spirit of the constitutional and statutory provisions that the owner should receive a full and perfect equivalent for the property taken from him.

In *Egan* v. *Philadelphia*, 108 Pa. Super. 271, 164 A. 813, land was taken for temporary use for exposition purposes in connection with a celebration of the city's sesquicentennial. Prior thereto, the land had not been used for any purpose and its rental value was admittedly the same after the termination of the exposition as it had been before. The court said:

"The principles involved and governing are the same whether there be a permanent taking or one for temporary use only. In the former the fair market value is to be ascertained, in the latter the fair rental value. Plaintiff is, of course, entitled to 'just compensation,' but that must be based on rental value, and not speculative in character. There must be reasonable certainty of the future beneficial use to which plaintiff's property may be put."

To the same effect, see *Louisville, etc., R. Co.* v. *R. E. E. DeMontluzin Co., Inc.*, 166 La. 211, 116 So. 854, and *In re Condemnation of Lands for Military Camp*, 250 F. 314.

In *Pierce* v. *Platte Valley Public Power, etc., Dist.*, 143 Neb. 898, 11 N. W. (2d) 813, the court held that where land was temporarily taken or damaged, the measure of compensation was what the property was fairly worth for the time it was held. There the measure of damages was held to be the value of the crops, which could have been grown upon the land by the owner during the period the land was held.

"Where land is taken, not to be held permanently, but only for temporary use, the measure of compensation is not the market value, but what the property is fairly worth during the time which it is held, * * * ." 29 C. J. S., Eminent Domain, section 142.

In *Kansas City So. Ry. Co.* v. *Commissioner of Internal Revenue*, 8 C. C. A., 52 F. (2d) 372, the United States took temporary possession of the properties of a railroad and used and operated the properties during a 26 months period, from January 1, 1918, to February 29, 1920. While that case involved primarily a question of taxable income, the court approved a settlement between the government and the railway company for the use of its properties, based on the carrier's customary income for a test period of the three years preceding the seizure of the properties by the government.

In *United States* v. *General Motors Corp.*, 323 U. S. 373, 65 S. Ct. 357, 89 L. Ed. 311, 156 A. L. R. 390, where a warehouse was taken from a tenant, holding under a long-term lease, for temporary use by the federal government, the value of the temporary occupancy was held to be the market rental value of the building, plus an allowance for fixtures and permanent equipment of the long-term tenant destroyed or damaged in the taking.

The facts in *Prince Line, Ltd.* v. *United States*, 283 F. 535, are somewhat similar to those here. The plaintiff there brought an action against the United States for compensation for the temporary possession and use by the United States of a certain pier in New York City. The government contended that it should pay only a reasonable rental value. The plaintiff claimed that just compensation was the amount of profit actually received by the government for the use of the pier. In sustaining the plaintiff's contention the court said:

"No amount of good intention on the part of the government's servants, or zealous care for the public revenue, will excuse or serve as a defense against a positive wrong inflicted by the government itself. If the government, through the taking of the plaintiff's property at less than 'just' compensa-

tion, actually received more money for the use of the property than it paid, with no lapse of time or changed conditions, the plaintiff has a right to ask that its compensation be increased, so as to receive the actual amount of profit received by the government, which is admittedly fair in amount, and which would in no way convict the plaintiff of the charge of profiteering."

At the time of the taking over of its properties by the Highway Commissioner, the Chesapeake Ferry Company was a going concern, temporarily stalled by a strike of its employees. Immediately upon the taking over by the State its whole organization, physical properties and personnel were quickened into action. There was no change, except in the name of the operator. Prior to the taking, and at the time of the taking, the most advantageous and valuable use of the property was in a ferry service. It was peculiarly adaptable to the existing demands of the community and such as might have been reasonably expected in the future.

The contention that the State is entitled to a portion of the earnings accrued during its operation of the properties of the Ferry Company is based on two grounds: (1) That the earnings were excessive because of exorbitant and unjust toll charges; and (2) that, by reason of the labor strike, the ferry properties would have remained idle and produced no earnings or profit but for their operation by the State under its sovereign power. These contentions only serve to confuse the issue before us.

It does not appear necessary to answer the first ground. The toll rates were fixed by a paramount State authority—the State Corporation Commission (Virginia Constitution, sections 153-156; Virginia Code of 1942 (Michie), sections 3709-3711)—and approved by the Legislature in the Act authorizing the operation of the properties by the State. (Acts 1946, ch. 39, sec. 4.)

We are not here concerned with the merits of the controversy between the employer and employees, nor the effect of the strike. We are concerned only with the value of the use of the properties, based on their availability and adapta-

bility for their most advantageous use. That value is affected neither by the ability or inability of the condemnee to utilize them, nor by the ability or inability of the condemnor to adopt them to a particular purpose.

Questions involving labor disputes and remedies are not before us, and if they were we could not pass upon them in this proceeding. The record does not disclose whether the controversy was due to a question of wages, hours, or working conditions. It was not until the enactment of chapter 9, Acts of Assembly, 1947, page 24, that the Highway Commissioner was forbidden to adjust the grievances of the employees, or increase their wages, if he deemed an increase justified by the nature of services rendered, higher living expenses, and loyalty to the Commonwealth. How, then, can we fairly or correctly say here that the earnings of the utility were at the expense of the employees? The employees, in continuing their work and in receiving the wages paid them, have supposedly worked also for the profit and benefit of their employer, as is usually expected and required in business and commercial enterprises. Regardless of the decision in this case, they will receive no increase in wages for work performed.

Under constitutional and statutory provisions of Virginia (Virginia Constitution, sections 153-156, and Virginia Code of 1942 (Michie), sections 3709-3711), the State Corporation Commission is charged with the paramount duty and authority to prescribe rates, charges, and classifications of traffic for transportation and transmission companies, subject to review by this court, as therein provided.

Rate-making is an involved and complicated proceeding. It has no place in this case, and we cannot here determine whether the State Corporation Commission erred in prescribing excessive toll rates. The rates allowed were the legal rates, and the operation of the properties by the State did not necessarily have the effect to decrease the value of their use. And be it remembered that the Act of February 22, 1946, expressly provided that the Highway Commissioner should

collect "the same charges, tolls, or rates as were customarily imposed by the ferry before the delivery" of the properties.

Apparently, the Act provided no incentive either to the owner or its employees to reach a settlement of their dispute. How long this controversy might have continued if the State had not taken over the properties we do not know. There would have been no service to the public as long as the properties remained idle, and there would have been no earnings from their operation if they had not been available for the purposes for which they were employed. In taking over the properties, the purpose of the State has been served, and is being served. For performing his duty efficiently and without loss, the Highway Commissioner is to be commended. He had the helpful assistance of the properties, the personnel, and organization of the Ferry Company, without which the profitable results could not have been accomplished. The State has not used any of its property, or expended any of its funds. It has suffered no loss, and under the decree of the trial court it is protected from possible loss. The State has merely made the business and enterprise of the Ferry Company produce what they were capable of producing in the use to which they were most advantageously adapted.

Complaint is made that the owner has not put itself in position to demand and receive a return of the properties.

The terms and conditions under which the appropriated property may be returned to the owner have been fixed by statute. The owner had no volition in the matter. The failure of the statute to fix a definite period for the temporary occupier lies with the Legislature. The remedy for any hardship upon the State also lies with the Legislature.

The Highway Commissioner tells us in his brief that the property of the Ferry Company is assessed for taxation at a value of $240,000. On the other hand, the Ferry Company claims it is worth millions of dollars. It is the duty of the State Corporation Commission to assess the property for taxation. (Tax Code of Virginia, section 221.) We are not

advised as to the method or rule by which the assessment was made. Methods of assessment vary greatly and, due to uncertainty in the method, rarely indicate true values. For that reason assessed valuations are not generally considered as evidencing market values. It is significant that neither party has here presented any evidence relating to the cause of the labor dispute, to wages, ferry tolls, earnings, or assessment for taxation.

It is recognized that it is almost impossible to formulate a rule governing the basis of compensation in all cases, because of the many and varied circumstances to be taken into account in determining the value of property or the value of its use. But where the circumstances do not relate to the availability and adaptability of the property, no modification of the general rule governing compensation is required. Where property taken permanently has no market value, or property taken temporarily has no market rental value, the owner is entitled to some compensation for what is taken from him. In such cases, recourse must be had to some other mode for ascertaining value. Here the value of the use of the property taken temporarily may be readily ascertained from the tolls allowed under constitutional and statutory authority. The temporary possession and operation by the Highway Commissioner made no change in that value. He could not have reduced it, even if he had reduced the tolls. What the properties were capable of producing has been shown by the return received from their operation. That is what the owner would have received under normal conditions. Nothing is left to guesswork.

Public necessity is of the essence of the exercise of the sovereign power of eminent domain. Payment of just compensation is an inseparable incident of its exercise. Just compensation, "the full and perfect equivalent of the property taken," precludes the idea of profit to the condemnor.

It is not the purpose of eminent domain to afford the sovereign an opportunity to make a profit from property taken or used. Its purpose is to allow the sovereign to best meet

and satisfy the public necessity and interest. Ascertainment of profit or compensation to the condemnor is not authorized or required. That would be eminent domain in reverse. Compensation for the exercise of the sovereign power of the State in eminent domain is as abhorrent to our theory of government, and the principles governing eminent domain, as is compensation to the State for the enforcement of a statute forbidding mass picketing in labor disputes, or for converting privately owned swamp land into a water reservoir for public use.

In eminent domain the measure of compensation deals with property, not with persons. This court and the courts of this country are unanimous in holding that neither the ability nor inability of the owner, nor that of the condemnor, to make use of property permanently taken has any bearing on its fair market value. The same rule should apply with equal force as to the value of the use of property temporarily taken. Fair market value of property taken permanently is to be estimated with reference to the physical value of the property at the time of the taking, considering the uses for which it is most suitable, and having regard to the existing public demand or wants of the community, or such as may be reasonably expected in the near future. The measure of compensation for the use of property temporarily taken is what the property is fairly worth for the time which it is held, having regard to the foregoing considerations. If it is productive, the net earnings derived from its most advantageous use, under proper management, provide the safest indication of the value of its use. Profit to the condemnor for such use is not a matter for consideration.

Rent is but a name for the return made by the tenant or user of property to the owner for the use thereof. It is measured by what the use of the property is worth or thought to be worth by reason of its availability, adaptability, and productivity. In general, it may be said that the fair rental value of agricultural land temporarily taken is the value of the crops that could be grown on it. (*Pierce* v.

*Platte Valley Public Power, etc., Dist., supra.*) For a pier, it is the amount which the owner may lease it for. (*Phelps* v. *United States,* 274 U. S. 341, 47 S. Ct. 611, 71 L. Ed. 1083, and *Prince Line, Ltd.* v. *United States, supra.*) For an apartment, it is the customary market charge for apartments of like character similarly situated. For productive commercial and industrial enterprises, it is the return which their owner would have received from the conduct of such business, under proper management.

Under the peculiar facts and circumstances of this case, and the provisions of section 6 of the Act authorizing this procedure, the trial court did not undertake to fix the measure of compensation at the time it ordered the possession of the properties to be delivered to the State. The properties were immediately taken over and operated under exactly the same conditions as existed theretofore. In reality, the owner thereafter conducted operations under State control. It does not complain of the manner of operation. The State collected the toll charges which the owner would have received had it been permitted to operate in its own behalf. The value of the use of the ferry properties was necessarily measured by the net revenue return. Consequently, it is not necessary to estimate that value. It can be exactly established and determined by an accounting between the parties. The Ferry Company claims only the net revenue produced from the use of its properties, that is, the established worth of their use. The State is entitled to no part of the value of their use. The owner is entitled to nothing less than the full value.

Accordingly, the trial court, in a situation much more favorable for the determination of just compensation than in an ordinary case of condemnation, correctly held that the gross revenues resulting from the operation of the ferries by the Highway Commissioner, less all reasonable expenses of operation and management, was a fair and just compensation to the owner for the use of its properties. The properties of the owner produced that balance, not the Highway Commissioner. Unless the owner is paid that compensation, it

will not receive the full equivalent of the value of the use of its properties.

The trial court did not have to estimate or speculate as to the measure of compensation by resorting to a specific rule governing compensation, as would have been necessary had it been required to fix the compensation before the condemnor had an opportunity to use the property. It thus happened, under the particular circumstances, that the net earnings showed the actual value of the use. Where just compensation is not required to be ascertained until the worth of the property has been definitely established in dollars and cents, and no estimate of worth is required, the realities of the situation show the basis of compensation. In such a case, reason no longer supports the rule that compensation for use should be based on an estimate of fair rental value, rather than on the established worth of the use, and, in the absence of reason, such a rule fails.

As I see it, any method or measure of compensation to the State for the use of its sovereign power must be based on arbitrary reckoning, the interjection of a new element in the ancient doctrine of eminent domain,—a strange bedfellow for hitherto highly respected principles.

For the foregoing reasons, I am of opinion that the decree of the trial court should be affirmed and the case remanded for such further proceedings as may be necessary and proper to carry out the provisions of that decree.

HOLT, C. J., concurring.